## PARKER v. NEW ENGLAND OIL CORPO-RATION.

### Petition of WILTSEE.

(District Court, D. Massachusetts. October 3, 1925.)

### No. 1747.

**I. Corporations ⬤⟿574—Under decree in receivership approving plan of reorganization, committee held fiduciaries for all.**

By decree in receivership proceedings approving plan of reorganization submitted by intervening noteholders' committee to be carried out through them, they became fiduciaries for all the creditors and parties beneficially interested, and not merely for those whose claims had been assigned to them.

**2. Corporations ⬤⟿574—Committee intrusted with carrying out plan of reorganization has burden of showing exercise of reasonable skill, prudence, and judgment.**

Noteholders' committee, intrusted by decree in receivership proceeding with carrying out plan their plan of reorganization, thus becoming fiduciaries, have burden of showing that in discharge of their duties they exercised reasonable skill, prudence, and judgment.

**3. Corporations ⬤⟿574—Documents merely annexed to and referred to in petition for approval of plan of reorganization held not approved with plan.**

Typewritten documents, annexed to petition of intervening noteholders' committee in receivership proceeding for approval of their plan of reorganization, and referred to by petition simply as "contracts * * * for carrying out the plan," even if showing to one understanding them that the committee were in form contracting with two of their members and a third person for marketing new bond issue on terms permitting them a contingent profit, not having been brought to the court's attention, were not approved as part of the plan; it being for the pleadings of its fiduciaries fully to inform, and not for the court to hunt for concealed fraud therein.

**4. Corporations ⬤⟿574—Member of committee intrusted by decree with reorganization, though first opposing, by assenting to others' plan, liable with rest for maladministration.**

Though member of committee intrusted by decree in receivership proceedings with carrying out reorganization first opposed plan of the others, he, by then assenting thereto, joined in the maladministration and was liable with the rest.

**5. Corporations ⬤⟿574—Committee for reorganization guilty of breach of trust in allowing directors to make large secret profits in sale of bonds.**

Committee intrusted by decree in receivership proceeding with carrying out reorganization was guilty of breach of trust in allowing directors, made such for the benefit of interests adverse to the company, to make large secret profits in selling of bonds; the directors, under the circumstances, not being entitled even to reasonable compensation therefor.

**6. Corporations ⬤⟿574—Payment from receivership estate, with approval of reorganization committee, of attorney's fees for services not done for company's benefit, unwarranted depletion.**

Payment from receivership estate, with approval of reorganization committee, of attorneys for work not done for benefit of the company or the beneficiaries of the court's trust, but in attempt to prevent a ruinous contract of purchase for the company, made through an interlocking directorate, coming to the knowledge of the court and the company's noteholders, whose estate was thus despoiled, was an unwarranted depletion of estate.

**7. Trusts ⬤⟿179—Trustees held to faithful performance of fiduciary relations.**

Trustees must be held to faithful and reasonably competent performance of fiduciary obligations.

**8. Corporations ⬤⟿ 574 — Reorganization through disqualified committee invalid.**

The entire committee, intrusted in receivership proceedings with carrying out reorganization, held disqualified, rendering reorganization invalid; two of them and their counsel being disqualified by adverse interest or past action, and the others knowing of a contract ruinous to the corporation, made by its directorate in the interest of another concern, and that the committee was constituted to conceal it from the court and from the mass of creditors, and enforce it for the benefit of the other concern, and their acts having likewise been adverse to the interests of their cestuis, and the plan of reorganization effected not being that approved.

**9. Corporations ⬤⟿574—Decree of approval of plan of reorganization vacated for fraud, saving rights accruing in good faith without notice, except as to any creditors chargeable with knowledge.**

Decree of approval of plan of reorganization under receivership proceeding, under the evidence, held obtained by fraud, and therefore to be vacated, except as to any creditors chargeable with knowledge disentitling them to rescind their acceptance of the effect of reorganization, saving, however, rights of bona fide purchasers of bonds under the reorganization.

**10. Corporations ⬤⟿574— Court in receivership proceedings owes duty to give creditors notice of unjust and illegal treatment by committee for reorganization.**

The court in receivership proceedings owes duty to give creditors notice of unjust and illegal treatment by committee for reorganization, and of their rights on account thereof.

**11. Corporations ⬤⟿574—Creditor successfully attacking for fraud reorganization by committee in receivership to be exonerated from his expenses.**

Creditor of corporation, successfully attacking for fraud reorganization by committee in receivership proceeding, is entitled to exoneration from his expenses therein.

In Equity. Receivership proceeding by Henry S. Parker against the New England Oil Corporation. On petition by Ernest

Wiltsee to avoid a reorganization made through a committee. Decrees in accordance with opinion.

See, also, 4 F.(2d) 392.

Sherman L. Whipple, Frederick Foster, and Claude B. Cross, all of Boston, Mass., for petitioner.

Robert G. Dodge and Edward E. Blodgett, both of Boston, Mass., for noteholders' committee.

ANDERSON, Circuit Judge. Wiltsee is an adjudicated, unpaid, creditor of the respondent corporation for $176,000. 3 F.(2d) 424. He brings this proceeding in behalf of himself and all other creditors who may hereafter join, challenging the validity of a reorganization of an oil enterprise effected through a receivership of the respondent corporation in this court by a committee consisting of Francis R. Hart (chairman), Alfred L. Aiken, Frank Finsthwait, Allan Forbes, Thomas H. West, Jr., and Daniel G. Wing, who on their own petition had been made parties as representatives and assignees of creditors of the receivership estate, in order to effect a reorganization.

He has filed also a stockholder petition, for similar or analogous purposes, in behalf of himself and other stockholders of the New England Oil Refining Company who may hereafter join; but this petition, with the assent of counsel on both sides, rests in abeyance, without prejudice.

The gist of his creditor petition is that the committee, as fiduciaries, so maladministered a solvent estate, given into their control, on their own petition, by the court, as to render themselves personally liable to Wiltsee, and to other creditors who may hereafter put themselves in like position, for the amount of their unpaid claims against the receivership estate, plus also his reasonable expenditures incurred in disclosing to the court the maladministration.

This proceeding is a logical and legal development of the ruling made by this court in an opinion dated July 18, 1924 (4 F.[2d] 392), in which, on a brief review of the papers in the clerk's office, the court held that this committee were fiduciaries, like the promoters of a corporation, citing Old Dominion Copper Co. v. Bigelow, 188 Mass. 315, 320, 74 N. E. 653, 108 Am. St. Rep. 479; s. c. 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314; Erlanger v. New Sombrero Co., 3 App. Cas. 1218; Haywood v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725—and that "they had the general rights and powers and were subject to the general obligations and limitations of trustees." From this ruling, no appeal was taken; it was accepted as the law of the case; under it the committee have filed two reports of their administration, one dated August 27, 1924, and one dated May 19, 1925.

The trial has consumed nearly 40 days, with a resultant record of about 3,500 pages, besides about 175 exhibits, several of which are books of records in large part material to the issues. There are no adverse witnesses. It is, in a very real sense, an ex parte showing by trustees of their administration of a trust estate. But the essential and controlling facts were elicited only by long and searching cross-examinations, and from letters, documents, and records called for by Wiltsee's counsel and used in cross-examination. Some of the direct testimony was highly misleading, to use no harsher term; it required long cross-examination, and the production of many documents, to correct it.

It should be added that much of the evidence has no bearing on the real issues. This is due—partly to the fact that Wiltsee's counsel necessarily proceeded more or less in the dark; partly to the fact that, in the early stages of the trial, Wiltsee's counsel was seeking to show that the reorganization was directed towards creating an illegal control of the oil market, an issue which the court, in a memorandum of decision dated June 26, 1925, ruled should not be tried as a part of this proceeding; and partly to the confusing and misleading character of much of the direct testimony.

The facts of controlling importance became, therefore, ascertainable only by analyzing and combining records, letters, telegrams, memoranda of conferences, admissions, frequently belated and reluctant, as to the subject and substance of such conferences.

With such a record, the task of elimination, analysis, and reasonably brief and succinct statement of the significant facts has involved many days of study and labor. But, in spite of the difficulties, the dominant facts are established beyond reasonable doubt.

Under the reorganization as planned and carried out by the committee, creditors of the receivership estate received for their claims preferred stock of the New England Oil Refining Company (the chief subsidiary of the corporation in receivership) equal at par to the amount of their claims, plus a like number of shares of no-par common stock. All creditors except Wiltsee assigned their claims to this committee or its nominee, the Old Colony Trust Company, and received such stocks in prima facie settlement of their

claims. The committee, or the Refining Company in their behalf, have offered, and apparently still offer, a like settlement to Wiltsee, and claim that, under the doctrine of Phipps v. Railroad (C. C. A.) 284 F. 945, 28 A. L. R. 1184, he has no other rights. Wiltsee, on the other hand, claims that, on the facts now disclosed, he is entitled to full payment of his claim, with interest, from the committee, plus exoneration from the expenditures incurred in these proceedings, and that other creditors are entitled to rescind their settlements and have like relief.

The chief questions therefore, are:

(1) Was the reorganization invalid? This is the gist.

(2) If invalid, what affirmative present duty is owed by the court to creditors now presumably uninformed as to its invalidity?

(3) If invalid, may the other creditors return their stocks, rescind their settlements, and thus be remitted to rights against the committee?

In approaching the problems presented on this record, it is necessary to bear in mind the practice and procedure of this court in administering receivership estates. Generally, these "conservation receiverships" involve conflicting interests among various groups. The natural and necessary course of the court has therefore been to promote the organization of these groups and the selection by them of committees, frequently appearing in court by counsel, in order that these representatives may work out and present to the court a plan of reorganization, agreed upon so far as possible. The court has neither time, capacity, nor disposition to instruct the scattered owners of a receivership estate as to how they may best reorganize their property in order to end the court's control of it. The present practice tends to remit the court to its ordinary and proper function of dealing merely with controversial questions or of settling rights between conflicting interests.

But this natural and necessary method obviously rests upon the fundamental assumption that committees or counsel appearing thus in court as representing various groups in interest are exactly what they appear to be —real, bona fide, representatives of those groups, and without any concealed, adverse, or disqualifying interests. If this assumption proves in fact ill-grounded, if committees and their counsel are not what they purport to be, but represent, secretly, interests adverse to those of their group, their presence and conduct in court are a fraud upon the court and upon the beneficial owners of the receivership estate. Counsel active in

this case were entirely familiar with this practice; they understood that committees, and counsel therefor, were commonly relied upon by this court to guide it in administering this sort of court trusts.

Moreover, in these receiverships the court itself is the trustee for the parties in interest; the receiver is nothing but "the hand of the court," holding and administering for the court the estate for the benefit of all parties in interest. A probate court—frequently a court of equity—on proceedings brought, controls other trustees; in receiverships, the court is the trustee. Its duties are primary, affirmative; they must be recognized and fulfilled.

The present issues may perhaps be best dealt with by first outlining the case as it was presented to and acted upon by the court, and then, by way of contrast, setting forth the realities of the situation—the actual relation of the Committee to the chief beneficial owners of the estate and to the Tanker Syndicate, and the plan of reorganization which they really devised and in fact, and not merely in appearance, effected.

Of the papers filed in the clerk's office, the documents of controlling importance on the present issues, are (1) the bill; (2) the receivers' first report; (3) the printed plan of reorganization; (4) the petition of the committee to be made parties; (5) the committee's petition for approval of the plan; (6) the report of the receivers upon the plan of readjustment, filed February 17, 1923. A few other documents have a minor bearing.

The bill was filed on July 14, 1922, and describes in considerable detail an oil enterprise in which the respondent (the New England Oil Corporation, a Virginia corporation) was a holding company, and will hereafter be so named. The two subsidiaries were the New England Oil Refining Company, hereafter called the Refining Company, a Massachusetts corporation, owning and operating an alleged large and highly profitable refining plant in Fall River, Mass., earning about $2,500,000 a year. The other subsidiary was the New England Oil Corporation, Limited, a Canadian corporation, and hereafter so called, owning rights in valuable oil fields in Venezuela, on which over $900,000 was alleged to have been expended. The Canadian company's stock was pledged. The Refining Company's stock, 75,000 shares ($7,500,000 par), was alleged to be owned, free and clear, by the Holding Company. The liabilities of the Holding Company are set out as follows:

"Five-year 8 per cent. notes, $5,762,000;

amounts due subsidiaries and other accounts payable, $3,235,000; overdue notes, $1,250,-327.90; deferred liabilities, $200,000—in addition to which there are various contingent and possible liabilities. A statement of such contingent and possible liabilities known to your complainant being annexed hereto and marked 'Exhibit 2.'"

In this Exhibit 2, the item of most present significance is:

"4. For guaranty of the commitments of the New England Oil Refining Company under contract with the Tanker Syndicate, Inc., dated November 29, 1921, which provides for repayment in monthly installments, from January 1, 1922, over a period of 10 and 12 years, of $1,300,000, which includes $520,000 serial 7 per cent. gold notes, and also the interest and principal on account of the purchase of seven tankers, the aggregate amount of which is undetermined."

The application for the receivership does not go on the basis of insolvency, or on the usual ground of embarrassment for lack of working capital; it goes on the ground of an emergency created by a judgment for about $1,000,000 for breach of contract in favor of the Island Oil Marketing Company, obtained in the District Court of the United States for the Eastern District of Virginia. In order to perfect an appeal from this judgment, a supersedeas bond for about $1,200,000 (which the corporation was in no condition to furnish) was alleged to be necessary, unless a receiver should be appointed. Moreover, if the suit resulted in a final judgment and forced sale of the stock of the Refining Company, the result might, as alleged, create a preference of the judgment creditor over other creditors of the Holding Company. The solvency of the Holding Company, the great prosperity of the Refining Company, and the large prospective value of the oil fields are emphasized in the bill.

Attached to the bill is a trial balance of the Refining Company as of December 31, 1921, showing assets and liabilities of a little over $19,000,000. In the column of liabilities is the following:

Liability under contract with Tanker Syndicate, Inc.
Five-year 7 per cent. serial coupon gold notes, dated January 1, 1922, beginning April 1, 1922..........$520,000.00
Payments due monthly over a period of years, bearing interest at 8 per cent. aggregating.............. 780,000.00
                                    _____
                                    $1,300,000.00

There is also a footnote, as follows:

"Note.—Monthly payments commencing January 31, 1922, to Tanker Syndicate, Inc., under contract with them dated November 29, 1921, on account of payment of interest and principal of the purchase price of seven tankers over a period of 10 and 12 years from January 1, 1922, not included in this balance sheet as the amounts are not finally determined."

It thus appears that the bill discloses no substantial asset in ships, but describes an *oil enterprise,* with a refining plant at Fall River and undeveloped oil fields in Venezuela as its chief assets.

The next document of present importance was the receivers' first report, filed on December 22, 1923. This report, some eight pages in length, besides exhibits, describes the oil enterprise very much as does the bill, including the relations of the respondent corporation to the enterprise as a holding company controlling the capital stock of the Refining Company and of the Canadian company.

This report describes the debts of the respondent corporation as consisting mainly of the five-year 8 per cent. notes—$5,762,000. No other large liability is set forth in terms. In the light of the evidence, the following quotation is of much significance:

"In addition to the claims referred to above, the defendant corporation, as guarantor of the Refining Company, is obligated under the terms of a contract with the Tanker Syndicate, Inc., a Massachusetts corporation, for the purchase of seven large oil tankers by the terms of which the defendant corporation is now obligated for a large sum of money, and as guarantor may be obligated to pay very large sums in the future. Pursuant to this contract, moreover, the defendant corporation has guaranteed an issue of $520,000 debenture notes of the Refining Company.

"A committee representing the holders of said 8 per cent. notes has been formed and represents, your receivers are advised, more than a majority of the outstanding notes.

"Semiannual interest upon said 8 per cent. notes was defaulted December 1, 1922, but the principal thereof cannot be declared due until 60 days after such default.

"Your receivers have not felt, accordingly, that the proper time has arrived for asking an order from your honorable court for presentation and proof of the claims outstanding against the defendant corporation.

"Shortly after the appointment of your receivers they were advised that negotiations

had been instituted between representatives of the noteholders and the executive committee of the Refining Company, looking toward a reorganization of the defendant corporation and its subsidiaries. Your receivers have kept in close touch with these negotiations, and have been advised of all developments."

This last sentence involved a very grave, though inadvertent, error, for Mr. Garfield knew very little of the real situation.

"No committee of the stockholders has been formed, but a large majority of the stock is held by persons who have been cooperating in the negotiations for reorganization. Moreover, it is proposed, prior to taking any final steps towards such reorganization, to call a meeting of all the stockholders of the defendant corporation, so that all interests may be informed and represented."

The whole of this report is important. Attached to it is a consolidated balance sheet (Exhibit B, set forth in the margin)[1] of the Holding Company, of its subsidiaries and of the receivership, as of October 31, 1922. This consolidated balance sheet of the whole enterprise, made more than three months after the appointment of the receivers, obviously should disclose completely every substantial item of assets and liabilities. It actually shows the chief assets as follows:

[1] New England Oil Corporation,

Gaspar G. Bacon and Irving McD. Garfield, Receivers, and Subsidiary Companies.

Consolidated Balance Sheet.

(Consolidating the Accounts of the Corporation, the Receivers, and the Subsidiary Companies.)

October 31, 1922.

Assets.

| | | | |
|---|---:|---:|---:|
| **Fixed Assets:** | | | |
| Land (at cost).......... | | $ 225,025.36 | |
|   Appraised value $1,648,576.00 | | | |
| Refinery, plant and machinery, drilling, marine, and general equipment | $10,892,182.84 | | |
| Equipment at customers' plants............ | 10,603.75 | | |
| Contract for provisional purchase of marine equipment........... | 1,107,778.00 | | |
| | $12,010,564.59 | | |
| Less reserve for depreciation............ | 700,795.19 | 11,309,769.40 | |
| | | | $11,537,794.76 |
| **Investments:** | | | |
| Mexican Crude Rubber Company (Encinal property)........... | | $ 20,811.20 | |
| Miscellaneous ............ | | 2.00 | |
| | | | 20,813.20 |
| **Oil Properties, Concessions and Development in South America:** | | | |
| Appraised by E. B. Hopkins, geologist 6/30/21........... | | .......... | 1,712,500.00 |
| **Current Assets:** | | | |
| Cash in banks ............ | | $ 163,099.10 | |
| Cash placed in escrow for Mexican taxes in excess of estimated requirements | | 68,577.99 | |
| Trade acceptances receivable ............ | | 27,578.72 | |
| Accounts receivable (accounts totaling $121,356.00 pledged to secure note payable for $100,000 per contra)........... | $1,629,930.20 | | |
| Less reserve for doubtful accounts........... | 132,949.38 | | |
| | | 1,496,980.82 | |
| Inventory of oil (at cost) (pledged to secure $670,000.00 bank acceptances per contra) ............ | $ 702,306.43 | | |
| Oil in transit ............ | 576,102.87 | | |
| | | 1,278,409.30 | |
| Inventory of material and supplies (at cost)........... | | 202,418.55 | |
| | | | 3,237,064.48 |
| **Prepaid and Deferred Expenses:** | | | |
| Discount and expense on 5-year gold notes........... | | $ 395,355.77 | |
| Discount and expense on 10-year first mortgage bonds........... | | 666,288.69 | |
| Development and exploration expenses........... | | 651,963.94 | |
| Prepaid insurance, interest, taxes, advance sales expense, etc........... | | 470,241.48 | |
| | | | 2,183,849.88 |
| Unadjusted debits ............ | | .......... | 184,377.51 |
| Cost of acquiring shares in subsidiary company in excess of par value.......... | | .......... | 30,325.09 |

Note.—Monthly payment from May 1, 1922, to Tanker Syndicate, Inc., under contract with them dated November 29, 1921, on account of payment of interest and principal of the purchase price of seven tankers over a period of eight and ten years from January 1, 1922, not included in this balance sheet as the amounts are not finally determined.

Note.—There are contingent liabilities as follows:
    (1) Possible liability for damages for failure to carry out a contract for the development of certain properties in Venezuela.
    (2) Suit by the receiver of the Island Oil Marketing Corporation for alleged breach of contract.

$18,906,724.92

"Fixed assets" (mainly the refining plant) and a "contract for provisional purchase of marine equipment, $1,107,778.00, aggregating $11,537,794.76; the Venezuelan properties, $1,712,500; current assets, $3,237,064.48." The chief debt liabilities are stated as the five-year 8 per cent. gold notes of the holding company, $5,434,000; the bonds secured by first mortgage on the refining plant, $1,715,000; current liabilities, $2,776,494.36. Current liabilities thus appear to be over $450,000 less than the current assets. The total of both assets and liabilities in this consolidated balance sheet is a little under $19,000,000. There is a footnote as follows:

"Note.—Monthly payment from May 1, 1922, to Tanker Syndicate, Inc., under contract with them dated November 29, 1921, on account of payment of interest and principal of the purchase price of seven tankers over a period of eight and ten years from

---

### Liabilities and Capital.

| | | | |
|---|---|---|---|
| **Capital Stock:** | | | |
| Preferred stock: | | | |
| Authorized issue ($100 par value) | $12,000,000.00 | | |
| Less: Reserved for conversion | $8,000,000.00 | | |
| Held in treasury | 2,050,300.00 | 10,050,300.00 | |
| Outstanding | | $ 1,949,700.00 | |
| Common stock: | | | |
| Authorized | 600,000 shares | | |
| Less: Reserved for conversion | 60,032 " | | |
| Outstanding | 539,968 " | 226,400.00 | |
| | | | $ 2,176,100.00 |
| **Capital Liabilities:** | | | |
| Five-year 8 per cent. convertible gold notes due June 1, 1925 | | | |
| Authorized | $8,000,000.00 | | |
| Less: Unissued | $2,238,000.00 | | |
| Held in treasury | 328,000.00 | 2,566,000.00 | |
| Outstanding | | $ 5,434,000.00 | |
| Ten-year 8 per cent. first mortgage bonds due March 1, 1931 | | | |
| Authorized and issued | $5,000,000.00 | | |
| Less purchased for sinking fund and canceled by trustees | 285,000.00 | | |
| Outstanding | | 4,715,000.00 | |
| 7 per cent. serial coupon gold notes due quarterly in twenty installments beginning April 1, 1922. | | | |
| Authorized and issued | $ 520,000.00 | | |
| Less installments due paid to trustees | 78,000.00 | | |
| Outstanding | | 442,000.00 | |
| Payments under Schedule A of Tanker agreement due monthly over a period of ten years bearing interest at 8 per cent | | 349,666.68 | |
| | | | 11,340,666.68 |
| **Current Liabilities:** | | | |
| Notes payable (note for $100,000 secured by account receivable for $121,356.00) | $ 752,950.00 | | |
| Bank acceptances payable | 670,000.00 | | |
| Accounts payable | 755,960.98 | | |
| Accrued salaries and wages | 11,808.51 | | |
| Accrued insurance, interest, taxes, etc. | 578,774.87 | | |
| | | 2,776,494.36 | |
| **Deferred Liabilities:** | | | |
| France & Canada Oil Transport Company—Note payable | $ 200,000.00 | | |
| Same—To be liquidated by counterclaim not shown in assets, per contra | 183,956.94 | | |
| | | $ 383,956.94 | |
| Provision for obligations under option for concessions No. 10 | | 200,000.00 | |
| | | | 583,956.94 |
| Reserve for difference in Venezuelan exchange | | | 20,636.94 |
| Reserve for repairs of tankers | | | 55,793.65 |
| Unadjusted credits | | | 25,608.91 |
| **Surplus:** | | | |
| Capital surplus arising from revaluation of New England Oil Corporation, Limited, stock | | $ 1,525,843.94 | |
| Capital surplus arising from purchase of this company's bonds at discount | | 8,550.00 | |
| Earned surplus at January 1, 1922 | $1,611,583.65 | | |
| Deduct: Loss on sale of securities | 2,400,635.61 | | |
| | $ 789,051.90 | | |
| Profit for current year to date before providing for depreciation | 1,182,125.46 | 393,073.50 | |
| | | | 1,927,467.44 |
| | | | $18,906,724.92 |

January 1, 1922, not included in this balance sheet as the amounts are not finally determined."

By necessary implication, this report and its attached balance sheets negative any involvement of the oil enterprise in a contract to pay over $17,000,000 for a tanker fleet, whether worth $17,000,000, or one-half or one-sixth of that sum.

The report sets forth that the business of the Refining Company has been rapidly increasing, but that it is handicapped "by lack of cash and working capital resulting in part, at least, your receivers believe, *from the increase of its business.*" The receivers therefore suggest new financing through a bond issue, and that in a separate petition they are seeking power to vote the stock of the Refining Company in their hands in favor of such reorganization as would involve such new bond issue. This petition also sets forth that a committee has been formed under an agreement dated November 15, 1922, whose members have for a long time been fully acquainted with the affairs of the oil companies; that this committee are impressed with the necessity of additional working capital, and that such bond issue will therefore be in aid of any contemplated plan of reorganization.

After due order of notice, no one objecting, a decree was entered on January 10, 1923, authorizing the receivers to vote the stock of the Refining Company for an issue of second mortgage bonds for $5,000,000, and also to change the capital stock of the Refining Company, so that it would have preferred stock of a total par value of $10,-000,000 and 1,500,000 shares of common stock without par value—"the provisions of said shares and the terms and conditions upon which they, as well as the foregoing bonds, shall be issued, sold, or otherwise disposed of to be agreed upon between the board of directors of said company and the petitioners as receivers. Any agreement herein provided for, which the petitioners as receivers may make with said board of directors, is to be subject to the approval of the court."

Parenthetically, the court never approved of the agreements actually made for the disposition of these stocks and bonds. This alone might be enough to invalidate the reorganization. But there is much more.

This decree also orders that the case stand for further hearing, and that "a draft of such plan of reorganization of the defendant corporation and of its subsidiary, the New England Oil Refining Company, as may be under consideration by the parties in interest, shall be filed in court, to the end that all parties may have an opportunity to consider the same and be heard with reference thereto."

Such plan was filed on January 14, 1923. A full copy of it is attached to the opinion of July 18, 1924, supra. 4 F.(2d) 392.

The plan was, in essentials, simple enough. It contemplated the abandonment of the Holding Company, and turning over all assets to, or for the benefit of, the Refining Company, canceling intercompany obligations. The capitalization of the Refining Company was to be so changed as to give the Holding Company's creditors preferred stock equal at par to their claims, plus a like number of shares of no-par common stock.

Tied into this plan was a refinancing proposition for a second mortgage bond issue of $5,000,000 *for working capital.* To make possible the flotation of this bond issue, new common stock of 1,500,000 shares (no par) was provided, one-third of which was set aside to meet stock warrants, one to go with each $1,000 bond, giving the holder within ten years an option to buy at $10 per share 100 shares. This reduced the *immediate* issue to 1,000,000 shares. Obviously, if this option should be exercised by all the bondholders, $5,000,000 in cash (enough to pay off the bond issue at par) would thus be provided; great success in the oil fields might make the option valuable. A block of 560,000 shares of the new common stock was to go to the bond purchasers, as an additional inducement for them to buy these bonds at 85. Of the balance of about 440,000 shares, about 190,000 shares were for old creditors and stockholders, leaving 250,000 shares distributable, at the discretion of the committee, to officials, employees, etc.

It thus appears that the plan destined more than one-half of this immediate common stock issue of 1,000,000 shares for the furnishers of new money, on the obvious theory that only thus could new money be obtained on a second mortgage by an oil concern with undeveloped oil fields. Only 250,000 shares —one-fourth of the immediate issue of 1,000,000 shares—was left for discretionary distribution by the reorganizers; everything else was definitely provided for. The plan continues:

#### "Sale of General Mortgage Bonds and Common Stock.

"The noteholders' committee will endeavor to arrange for the sale of $5,000,000 principal amount of the general mortgage bonds, to-

gether with 560,000 shares of the common stock, for the sum of $4,250,000 together with accrued interest on the general mortgage bonds. Negotiations for this sale are now being conducted with Messrs. Malcolm G. Chace, Francis R. Hart, and Daniel G. Wing as syndicate managers under an agreement dated 11th of December, 1922, who are attempting for the purpose of making such purchase to complete the syndicate provided for in the said agreement."

The second sentence, "Negotiations for this sale," etc., does not, fairly construed, mean that the reorganizers proposed to sell these bonds *to* Chace, Hart and Wing as managers; it does mean that two of the reorganizers, with a third outsider, were negotiating for the sale *to* a syndicate of outsiders, to be conducted by them. In effect the three syndicate managers were only a subcommittee of the general reorganizing committee, and bound to the same fiduciary obligations. There was no disclosure of any possibility of the Committee's dealing with themselves or with any interested directors of any of the corporations involved. On its face it was a plan to get from the investing public new money for alleged needed working capital on terms that seemed very stiff for an enterprise already highly prosperous.

Except for the advice of these financiers that new working capital, obtainable only on a second mortgage, was needed to improve the value of the preferred stock going mostly to the creditors of the receivership estate, the natural and simple method of administering this receivership would have been to take proof of claims and then to distribute the stock of the Refining Company ($7,500,000 at par) to the creditors (about $6,500,000), par for par, turning any balance not found due the holding company's stockholders, together with the stock of the Canadian company, over to the treasury of the Refining Company. This, however, would have given the real owners of this enterprise control of their property, a result not desired by this Committee—for reasons which will appear below.

As the plan showed that the Committee intended, in effect, to take over the administration of the receivership estate, assuming many of the functions which ordinarily devolve upon the receivers, the court required that they be made parties to the record, so that full legal responsibility for the use they might make of the powers they sought might appear as of record. As the event shows, this was a very important requirement; it put this Committee in a position closely anal-

ogous to that of duly appointed trustees, accountable through the court to the beneficiaries for their administration of the trust estate. Accordingly, on January 9, 1923, the Committee filed a petition, allowed on the same day, to be made parties to the suit. The petition alleges that they "are a committee representing the holders of 5-year 8 per cent. convertible gold notes of the defendant corporation; that there have been deposited with them as such committee nearly 70 per cent. of the total amount of said notes outstanding; that they desire to take all steps possible to protect the interests of the holders of said notes."

On January 23, 1923, the Committee filed a petition for approval of their plan of readjustment and reorganization. This petition was carefully drawn, so as to indicate that six bankers had worked out for scattered beneficial owners of the trust estate a wise, sound, and generally acceptable plan of reorganization. It is important; its body is quoted (without the exhibits attached) in the margin.[2]

---

[2] Petition of Noteholders' Committee for Approval Plan of Readjustment and of Reorganization.

"Now come Francis R. Hart, Alfred L. Aiken, Allan Forbes, Frank Finsthwait, Thomas H. West, Jr., and Daniel G. Wing, noteholders' committee under an agreement dated 15th November, 1922, and respectfully petition this honorable court as follows:

"I. Since the filing of the petition of the receivers of the New England Oil Corporation requesting authority to vote upon the shares of the New England Oil Refining Company in such manner as to authorize the New England Oil Refining Company to create an issue of bonds and shares of stock, the committee formed under the agreement dated November 15, 1922, representing a large number of the holders of the five-year 8 per cent. convertible notes of the defendant corporation have formulated a preliminary plan for the reorganization and readjustment of the defendant corporation and for the refinancing of its subsidiary, the New England Oil Refining Company.

"II. A copy of the said plan has heretofore been filed in this court, and a further copy, with amendments to date, together with preliminary drafts, subject to amendment, of the various contracts which it is proposed to have executed by the parties in interest, are annexed hereto for the information of the court and in order *to explain the method now contemplated by your petitioners for carrying out the plan.*

"III. There have been deposited under the terms of said agreement dated November 15, 1922, with your petitioners, over 68 per cent. of the five-year 8 per cent. convertible notes of the defendant corporation.

"IV. Your petitioners are informed and believe, and therefore allege, that said plan of reorganization is acceptable to all, or substantial-

On return of an order of notice, the petition came on for hearing before Judge Morton, during a short absence of the writer, who had previously had general charge of the receivership proceedings. On brief explanation of the plan, Judge Morton expressed doubt as to whether it was sound, mainly because the amount of working capital for the Refining Company seemed inadequate. He also wisely directed that the receivers should, before action by the court, file a written report of their views; this was done on February 17, 1923. The re-

ceivers recommended the adoption of the plan, stating, nevertheless, objections to certain features, mainly, the lack of adequate working capital, and that "in the opinion of your receivers the Refining Company will, shortly after the plan is put in force, have a floating debt of at least $2,000,000." Other objections were as to the heavy current charges for the sinking funds on the first and second mortgages.

As to the tankers, the report sets forth that "the Refining Company has a contract with the Tanker Syndicate, so called, for purchase

ly all, of the creditors of the defendant corporation.

"V. Your petitioners are informed and believe, and therefore allege, that the holders of a large majority of the capital stock of the defendant corporation are also in favor of the adoption of the proposed plan, and that they have, by proper corporate action taken since the filing of the original petition, passed votes authorizing so far as was feasible the execution of said plan, or any plan accomplishing substantially the same results.

'VI. Under the terms of said proposed plan, provision is made for furnishing the subsidiary of the defendant corporation, New England Oil Refining Company, on the continued and successful operation of which the value of the assets of the defendant corporation is dependent, with a large amount of additional capital, and also provides a method by which, if said plan is adopted and consummated, all the creditors of the defendant corporation will receive and accept in place of claims against the defendant corporation, securities of the New England Oil Refining Company, so that a complete settlement of the affairs of the defendant corporation may be made and these receivership proceedings terminated. Under the terms of said plan, moreover, provision is made so that the stockholders of the defendant corporation shall in accordance with the terms of said plan obtain an interest in the New England Oil Refining Company and so continue to participate in the business in which, as stockholders of the defendant corporation, they have formerly been interested.

"VII. Said plan further defines the terms, conditions, and provisions of the proposed mortgage under which the proposed issue of bonds of the New England Oil Refining Company is to be made, the terms, conditions, and provisions of the stock of the New England Oil Refining Company it is proposed to authorize, and the method, terms, and conditions of the disposition of said bonds and stock, so that at a meeting of the stockholders of the New England Oil Refining Company, if it is determined it would be advisable to proceed in accordance with the terms of said plan, said mortgage, said bonds and said stock can be authorized, and the manner and terms of the disposition of said bonds and stock determined.

"VIII. In the opinion of your petitioners the said plan is the best plan that has been suggested, or that it appears possible to accom-

plish, to the interests of the creditors and stockholders of the defendant corporation.

"Your petitioners therefore pray as follows:

"1. That the receivers of the defendant corporation may be authorized to participate in the said plan, and to do any and all things which may seem to them necessary or advisable to carry out and consummate the said plan.

"2. That the receivers of the defendant corporation may be authorized and directed to surrender the shares of the New England Oil Refining Company held by them as such receivers, or the certificates therefor, and exchange the same for or change the same into such preferred or common shares, or both, of the New England Oil Refining Company, as may be necessary to carry out the said plan.

"3. That the receivers of the defendant corporation may be authorized and directed to make such arrangement with the New England Oil Refining Company for the payment of their expenses and remuneration and such provision for contingent claims against the defendant corporation as may seem necessary or advisable to carry out and consummate the plan.

"4. That the receivers of the defendant corporation may be authorized and directed to adjust the claims of the creditors of the defendant corporation, and that the said receivers may be further authorized and directed as soon as the preferred and common shares available therefor under the plan shall have been received by the receivers to inform all creditors who shall prove their claims that, upon transferring their claims as required by the plan, they may receive the shares distributable thereunder in respect of their claims.

"5. That the receivers of the defendant corporation may be authorized to consent to, approve, and carry out any and all amendments, modifications, changes, and additions to the plan that may be authorized and approved by your petitioners.

"6. That an order of notice be issued to all counsel of record in the above-entitled matter, all known creditors of the defendant corporation, and all known stockholders of the defendant corporation, notifying such creditors and stockholders that the court had been asked to approve this petition, and notify all creditors of the filing of this petition, and to appear at such time as the court may designate, and show cause if any they have why this petition should not be granted.

"Respectfully submitted,

"Robert G. Dodge,

"Att'y for Noteholders Committee."

under conditional sale of seven oil tankers. The annual payments thereunder on account of principal, amounting to approximately one-half million dollars per year, must be met from the earnings of the company. In the opinion of the management of the Refining Company these payments will be earned by the operation of the tankers themselves."

The opinion of the management of the Refining Company as then controlled and motivated was entitled to no weight on a matter involving the Tanker Syndicate, as will later appear.

But, as the receivers reported that their objections had been considered and overruled by the committee, the gist of the report, so far as the court was concerned, is found in the following:

"The proposed general mortgage bonds are being purchased almost exclusively by banks and bankers and the Tanker Syndicate, who at the present time are holders of the 8 per cent. notes of the respondent corporation. As the plan eliminates all claims of the Refining Company, these notes represent over 95 per cent. of the total direct indebtedness of the Refining Company and all known contingent claims have assented to the plan."

This amounted to informing the court that the new 8 per cent. bonds were substantially all to be taken by the present holders of the 8 per cent. notes of the respondent corporation. In other words, the court was told by this report that the parties who already substantially owned the receivership estate were almost all in accord in accepting the plan proposed by the Committee, and were themselves to take the new bonds and stocks, with all the resultant chances of losses or of profits. It told the court that the then beneficial owners of the enterprise were putting in new money and readjusting their holdings according to the advice of the Committee. On the issues now presented, it is probably immaterial that Mr. Garfield, in the quotation above, erroneously represented the Tanker Syndicate as holders of the 8 per cent. notes of the respondent corporation. The important point is that the court's approval was obtained on representations made, both by the receivers and by the Committee, to the effect that the plan of reorganization was in essence nothing but a rearrangement of the bonds and stocks, new and old, under which the parties *then in interest* desired in the future to hold and manage their property. It excluded every reasonable possibility of the plans being for the benefit of any concealed, adverse, interest, or involving any fraud, in fact or in law, upon any one.

Under such circumstances, no court could properly do other than approve the plan; it was promptly approved by Judge Morton on February 17, as of February 12, 1923.

[1, 2] Counsel for the committee, in his final brief, concedes (as, of course, he must) that by this decree the committee became fiduciaries for "all the creditors and parties beneficially interested." The burden is "on them to show that in the discharge of their duties they have exercised reasonable skill, prudence and judgment." Ashley v. Winkley, 209 Mass. 509, 525, 95 N. E. 932, 933, and cases cited. Before the decree, they were certainly fiduciaries for all parties who assigned claims to them; whether also for noteholders who had not made such assignments is not of practical importance.

[3] One contention of the committee may as well be disposed of at this point. It is urged that the typewritten documents annexed to the petition for approval of the plan showed that the Committee were, in form, contracting with Hart, Wing, and Chace, as syndicate managers, for the sale of the bonds and 560,000 shares of common stock, on terms that permitted the syndicate managers to retain for themselves all common stock not found necessary to market the bonds at 85; that the syndicate managers in turn were selling to Peabody, Houghteling & Co. (bankers) on substantially the same terms; that the court was bound to discover from these documents this chance for a contingent profit by insiders, and must therefore be held to have approved it.

The so-called contracts attached to the petition, as distinguished from the petition itself, were not read to or by Judge Morton. He had no occasion to read them, or otherwise to form any view that these documents indicated any disposition of the receivership estate inconsistent with the printed plan and the receivers' report.

On analysis, this contention amounts to arguing that the court was not warranted in relying on the disclosures made by counsel; that the court should approach such disclosures with suspicion and distrust. For the petition for approval of the plan described these papers merely as *"contracts * * * for carrying out the plan,"* not as inconsistent with it or modifications of it. As ruled in the opinion of July 18, 1924, "the printed plan controls." The inconsistent so-called contracts were never brought to his attention, nor approved by the court. They were never read or considered by any judge of this

8 F.(2d)—26

court until the opinion of July 18, 1924, was in preparation. They were wholly unauthorized by the decrees of this court. The plan disclosed neither to the court nor to the mass of noteholders any attempted contracts of the committee of six, with two of the same committee, plus Chace, for contingent profits in cash or stock out of marketing the new bond issue.

The court was entitled to assume that counsel for the fiduciaries, who were seeking to advise the court as to the performance of its duty, would, in their pleadings, disclose all that the court ought to know as to the relations of the court's fiduciaries to the trust estate and to the contemplated reorganization. Under such conditions, the pleadings must fully inform. It is not enough that, viewed suspiciously, they might have warned the court that it should institute an investigation. It is not the duty of a judge to hunt for concealed fraud in the papers filed by counsel of this court. Counsel holding and practicing such a theory of professional ethics disregard the oath taken by all members of the Massachusetts bar (Gen. Laws Mass. c. 221, § 38), that they "will do no falsehood, nor consent to the doing of any in court."

Again, no amount of study of these blind and confusing documents annexed to the petition would have disclosed to the court the real evil of this scheme or the true relations of the Committee to the enterprise, the details of which are later set forth. Studied or disregarded, these documents had little significance, except to show a disguise of the real scheme. But, to repeat, because of its importance, neither in pleadings, nor in any other court papers, nor orally, was the substance of the real plan of reorganization, and the relations of the parties formulating the scheme, brought to the attention of the court responsible for the administration of this estate.

On May 29, 1923, the receivers filed a report denominated their second report, as distinguished from various other "special reports" referred to therein. It shows that the plan had been declared operative by the noteholders' committee on February 26, 1923, had been accepted by nearly all the creditors, and that the common stock had gone substantially as contemplated in the printed plan; that is, 500,000 shares were reserved under the warrants for later purchase by the new bondholders at $10 per share, 560,000 shares were "reserved for sale with the original issue of general mortgage bonds,"

and the balance was distributed or reserved substantially as the plan contemplated.

To summarize the case actually presented to and dealt with by the court:

(1) The receivership involved, directly, the stock of two subsidiaries of a holding company, and thus, indirectly, but *potentially*, the fundamental policies and management of the subsidiaries; the Refining Company being the chief going concern. These subsidiaries were throughout the receivership left by the court in the control of their existing officers, on the natural assumption that these officers faithfully and competently represented only the interests of the creditors and stockholders of those subsidiary corporations. Otherwise stated, the court left in the directorate of the Refining Company the control and management of *the chief assets of the receivership estate*.

(2) The receivers, both in their first report of December 22, 1922, and in their special report of February 17, 1923, on the submitted plan, in effect, advised the court that the chief beneficial owners of the receivership estate had intrusted their interests to the direction and control of leading bankers, and that the receivers recommended the adoption of such plan as should be devised and presented by these bankers.

(3) The court thereupon, on the committee's own petition, put them into practical control of substantially the entire trust estate, relegating the receivers to merely advisory or minor functions. All claims of creditors except Wiltsee's were finally assigned to the committee, or their nominee, the Old Colony Trust Company.

(4) The committee presented a plan involving a new second mortgage bond issue on the refinery, represented that the proceeds of these bonds were needed for working capital, and that the bonds were marketable only with the assistance of a bonus of over half of the proposed new common stock then to be issued, and informed the court that approval of this plan was desired by practically all the then owners of the receivership estate, who (as the receivers reported to the court) were themselves to take the new securities, with all the resultant chances of profit or of loss.

Having thus obtained the approval of the court of a plan of reorganization of the receivership estate, which appeared fair enough, even if not clearly sound as a business proposition, this committee proceeded to dispose of this trust estate in a radically different fashion, according to a

plan devised months before by Smith for the Tanker Syndicate and adopted by the committee, but never disclosed in its real essence to the court until after many days of hearing in the present proceedings.

The new bonds, instead of being sold to the existing creditors of the receivership estate at 85, accompanied by stock warrants for 500,000 shares of common stock at $10 per share, and with a bonus of 560,000 shares of common stock, were in fact sold by Smith and/or Chace, two directors and members of the executive committee of the Refining Company, to the investing public (mostly Smith's Scotch clients), at an average price of at least 95 flat, without any stock warrants, and without any bonus of common stock. Smith and Chace, directors of the Refining Company, one or both, realized from the transaction a cash profit of from $400,000 to $600,000, and also obtained for themselves or their nominees 527,000 out of the 560,000 shares of bonus common stock, besides the warrants for 500,000 shares more, good for 10 years, at $10 per share.

The proceeds of the bond issue ($4,250,000) were not intended for or used as working capital of the oil enterprise. About 41 per cent. of it was forthwith paid to the Tanker Syndicate, made up of the Old Colony Trust Company, represented by Hart, and Smith and Chace, or their concerns, for alleged arrears under the tanker contract hereinafter described; the bulk of the balance was used for reorganization expenses (about $200,000), or so applied to debts owed the banks represented on the committee as to leave the Refining Company practically without cash working capital.

Under the plan, the committee were given discretionary control over 250,000 shares of common stock for corporate purposes, "including for issue to officers and employees of the Refining Company." While of minor importance, this requirement of the plan was not complied with. The committee issued to Cochrane or his nominee 157,000 shares, to the committee and their secretary 25,000 shares, to Chace, Hart, and Wing as syndicate managers 15,000 shares, and to others, who, apparently, were "officers and employees of the Refining Company," such an amount of shares that the aggregate thus disposed of by the committee was, as the committee's second report shows, 298,152 shares. The large issue of 157,000 shares to Cochrane, 15.7 per cent. of the presently authorized issue, was neither within the scope of the committee's power nor made for the purpose of promoting the financial welfare of the oil enterprise. It was mostly a reward to Cochrane for assistance rendered in this reorganization.

This was what the committee did. To comprehend the full legal significance of their acts, it is necessary to understand the makeup of the committee, its dominating purposes, and their relation to the plan actually devised, or adopted, by them, but not disclosed to the court, and in this connection to state and analyze the status of the oil enterprise and of the Tanker Syndicate in November, 1921.

At that time the oil enterprise was functioning through the three corporations already described. The capital for the enterprise to this point had been furnished mainly, if not entirely, by two groups of investors: First, about $4,340,000 derived from the purchasers of an issue of $5,000,000 bonds secured by a first mortgage on the Refining Company's plant; second, about $4,836,000 derived from the purchasers of the $5,440,000 (eliminating an intercompany purchase) of the Holding Company's 8 per cent. gold notes.

This enterprise had been promoted by Cochrane, Harper & Co., who appear to have been bankers or promoters. Cochrane was the president or chief executive officer of the three corporations. Of the 8 per cent. notes issued by the holding company, about $1,500,000 were apparently taken by Cochrane, Harper & Co., by bankers as collateral security for the brokers' loans, and by others affiliated with the corporations; $500,000 had been taken by the United Fruit Company in connection with a trade, apparently deemed advantageous to the Fruit Company, for obtaining oil when produced in the Venezuela fields; the balance, about $3,500,000, had been sold to the scattered, investing public—about $1,500,000 in and about New York and Pennsylvania, others in Rhode Island, and, rather generally, in this locality. There were about 700 noteholders in all. The rights of the holders of the first mortgage bonds are apparently not involved in these proceedings; the rights of the scattered noteholders are particularly involved. Through the reorganization, now attacked, these noteholders received stocks on which no dividends have been paid; they have had no return on their investment since June, 1922.

Roughly, then, it appears that the investing public had furnished about $8,000,000 to $9,000,000 for this enterprise. Viewed optimistically, the refining plant, with its alleged earnings in 1921 of $3,500,000, was worth about the amount of the capital fur-

nished. The value of the oil fields in Venezuela was, of necessity, then unknown. Like other oil fields, they might prove a very great asset, or they might, because of expenditures in fruitless development work, prove a liability. There is nothing to indicate that they were not selected by competent engineers, and were not reasonably hopeful oil prospects. Of course, if this field turned out as productive as have some such fields, the enterprise would become very profitable; otherwise, it would be only an ordinary manufacturing and mercantile concern, in a highly competitive field.

This legal and financial structure obviously vested the control of the entire enterprise in the stockholders of the holding company. It is not contended that these stockholders had furnished any appreciable amount of capital for the enterprise. But their votes chose the directors who controlled it.

We have, then, the not uncommon, but highly undesirable, corporate business structure, in which legal and financial control is almost, if not quite, divorced from any personal investment by the voting control of the enterprise. Such a structure lends itself easily to irresponsible, ill-considered, or fraudulent action by directors. This situation (of directors in control over what was beneficially almost entirely other people's property) throws light upon the transactions hereafter sketched.

Obviously the creditors of the holding company were financially and in essence stockholders of the Refining Company and of the Canadian company. It follows that any large loss or improper liability incurred by the Refining Company would fall directly upon the creditors of the Holding Company.

Perhaps the most important single element in the financial situation of these oil companies was their relations with the Tanker Syndicate. The Tanker Syndicate was, in November, 1921, the Old Colony Trust Company, Peabody, Houghteling & Co., and M. G. Chace & Co. The Old Colony Trust Company is a large, well-known bank in Boston. Little appears as to the general nature of the business of Peabody, Houghteling & Co. and M. G. Chace Company. Apparently they are bankers and brokers. The president of Peabody, Houghteling & Co. is Alexander Smith; the concern will hereafter be referred to as Smith. M. G. Chace Company will hereafter be referred to as Chace, its president. In December, 1921, the Tanker Syndicate, Inc., was incorporated; its stock was owned in equal shares by these three banking concerns.

In April, 1920, a contract had been made by the Swiftsure Oil Transport, Inc., with the United States Shipping Board, the Old Colony Trust Company, and with some other concerns not now involved, for the construction of seven tankers, at an aggregate price. of $16,800,000. This undertaking was to be financed mainly on money furnished, partly by the United States on a first mortgage (ultimately for over $13,500,000), and partly derived from a second mortgage, in which the Tanker Syndicate was or became interested, apparently to the extent of owning or controlling about two-thirds of a second mortgage bond issue of $4,237,000.

This contract was made shortly before the end of the so-called "post bellum boom." It is common knowledge, and admitted by all, that during the next few months there occurred a tremendous drop in the value of all shipping, and that, for months prior to November, 1921, ships of all kinds were tied up, idle, nearly all over the world. The Swiftsure concern shortly became bankrupt and went out of existence. As it is not claimed that these seven tankers were worth the government's *first* mortgage of about $13,500,-000, it is obvious that the Tanker Syndicate, as investors in the *second* mortgage bonds, had lost their entire investment.

It was under these conditions that negotiations were entered into between the oil companies through Cochrane and the Tanker Syndicate. As a result, a contract was authorized by the boards of directors of the Refining Company and of the Holding Company, dated November 29, 1921, under which the Refining Company undertook to buy, provided the Tanker Syndicate should get title, these tankers at an aggregate price of about $17,300,000. Title to the tankers was to be taken by the Refining Company or its nominee; but the contract was to be guaranteed by the Holding Company, which was also to turn over to the Tanker Syndicate $100,000 at par of its stock. As a part of the transaction, the Tanker Syndicate agreed to loan the Refining Company $1,300,000, with interest at 7 per cent., of which, however, $520,000 was shortly thereafter to be repaid out of the proceeds of notes issued by the Refining Company and sold to the investing public. The real advance of the Tanker Syndicate for any considerable time was, therefore, less than $800,000.

It is in this extraordinary transaction that we find the genesis of most of the equally extraordinary subsequent happenings in connection with this receivership. At the time of this contract, the Refining Company had

no real need of owning a transportation system. It is not even claimed that tankers were not then in large numbers easily available for charter at highly competitive rates. Furthermore, the financial status of the Refining Company was not then such as to warrant it in making any investment in a transportation system, or in any other facilities not reasonably needed for the equipment and operation of its refining plant and the development of its oil fields. For these purposes, its indicated operating earnings (if its bookkeeping was on a sound and reliable basis, which is not free from doubt), at the rate of about $3,500,000 a year, furnished adequate means for wholesome and safe growth. Why, under such conditions, its directors should even consider committing their corporations to any substantial liability for transportation facilities has not been satisfactorily explained. The directors present on November 28, 1921, at the meeting of the Refining Company, which dealt with this proposition, were F. Douglas Cochrane, George W. Treat, Rudolphe L. Agassiz, Llewellyn Howland, Allan Forbes, John F. Perkins, John W. Farley, Hugh D. Scott, Bradley W. Palmer, R. M. H. Harper, and Gaspar G. Bacon. Treat represented the banking house that had marketed the first mortgage bonds, and "requested to be recorded as not voting in respect to all questions to be submitted to this meeting." The other directors appear to have voted in favor of authorizing the transaction.

The vote was not taken without warning of its significance. Ten days before, Farley, one of the directors, had written a long letter, in which in 12 paragraphs he pointed out some, though not all, of the controlling reasons against committing the corporations to this undertaking. This letter shows, what has otherwise appeared in evidence, that there was then some expectation that the government might be persuaded to reduce its first mortgage of over $13,500,000, for the reason that the ships the government thus practically owned were known to be worth only a fraction of that sum, and that in case of such reduction the proposed purchasers might perhaps get a reduction in the purchase price.

But it may as well be said here that the evidence utterly fails to show any legal commitment by the Tanker Syndicate, or even the claimed "gentleman's agreement," to the effect that any reduction thus obtained from the government should accrue to the benefit of the oil companies. On the contrary, the contract for the full amount of the purchase price was claimed throughout the receivership proceedings to be valid; and as late as January, 1923, a claim under oath for about $18,000,000 against the respondent was filed by the Tanker Syndicate in these receivership proceedings. Unless the contract was voidable, on this record, it was valid for the full amount of the contract price.

Paragraphs 6, 7 and 8 of Farley's letter are quoted in the margin.[3]

This letter informs the parties to this transaction that they could expect no reduction in the first mortgage, except by perpetrating a fraud on the federal government, by concealing the fact that oil companies, financially responsible, had obligated themselves to pay the full original cost of these ships.

This transaction was the subject of a report by the Shipping Board to the Senate of the United States, dated January 10, 1923, and put in evidence by agreement (Exhibit 83). This report shows, among other things, that the total cost to the government of these tankers was $17,565,733.59; that the government realized from the Swiftsure Oil Trans-

---

[3] (6) "In entering into the contract it has been strongly urged that, while there is a present obligation to pay the United States $150 and to get rid of their first mortgage, inasmuch as this is considerably in excess of the present market value of these boats, it is probable that the amount of this payment can be very materially reduced. It is, I think, however, only proper that your companies should realize that in this respect there is an extremely awkward situation." (The reference to $150 means per ton.)

(7) "In negotiating with the Shipping Board, it would seem that it might prove very difficult to conceal from them, or to refuse to tell them, what the real trade is with your companies. If, however, the Shipping Board once knows this and grasps the situation, they will see that, if they do nothing and give no relief as to the price of the vessels, the United States will ultimately be paid in full if your companies fulfill your obligations to the syndicate. If they do know this, even with the greatest desire to help, it will be readily appreciated that they will be in an extremely awkward position if they reduce their claims."

(8) "The argument of your companies, should such companies by this agreement become real purchasers of the vessels, is very weak as compared with that of most other claimants for reduction in price. Your companies did not buy either through patriotism or misguided judgment at the time when boats were high. They have entered into this transaction knowing all the facts at the present time, and have agreed to pay the prices covered by the contract at the very time when you or the syndicate will be arguing that the vessels are worth less than half as much. We feel, therefore, that there is a very distinct possibility that no reduction in price can practically be obtained from the government."

port, Inc., $3,840,000; and by a sale of the first mortgage of about $13,500,000 on March 20, 1922, to M. G. Chace Company, $2,940,-000—a total of $6,780,000, with a resultant loss of nearly $10,800,000 on the entire transaction.

The general policy of the Shipping Board was stated to be that of seeking purchasers for ships in or affiliated with the concerns originally interested in their building, many of which had become insolvent; that the only available collateral was the ships themselves, for which there was no market, especially in view of the enormous stock of idle ships already held by the board and of which it was able to dispose of substantially none. The report proceeds:

"One of the important cases was the Swiftsure Oil Transport, Inc. Using the same methods of determining values, the notes of this company were sold to the only bidder, M. G. Chace Company, for $2,940,000 cash, which equals $35 per ton. This amount was much higher than the original bid of M. G. Chace Company, and was only secured after long negotiations. There was then, and has been since, no real market for tankers, as evidenced by the sale, during 18 months of earnest effort, of only 6 tankers at $45 per ton, most of which were sold long after the settlement was made of the Swiftsure Oil Transport, Inc., case, involving 7 tankers in one transaction.

By this settlement the United States has received a total of $85 per ton, and now has left 84 tankers, which it cannot sell at $45 per ton.

"Subsequent to this settlement, which was made, owing to the precarious financial condition of the Swiftsure Oil Transport, Inc., the company went into bankruptcy, indicating that either the conditions of settlement were too severe, or that some subsequent event precipitated the position which was threatened previously. In either event, the board's action resulted in the payment to the United States of $2,940,000 cash, which could then have been obtained in no other manner, and, at best, failing this settlement, the United States would have received 7 tankers to add to its large idle stock of 84 unmarketable tankers, and then only after lengthy and expensive litigation in bankruptcy courts and other courts."

This statement that the government realized from the Swiftsure Oil Transport, Inc., $3,340,000, cannot be reconciled with the Tanker Syndicate claim of a second mortgage bond issue of $4,237,000; for, if the proceeds of this second mortgage bond issue

had (apart from any possible capital contribution by the Swiftsure Oil Transport, Inc.) reached the government, the payment on the tankers should have substantially exceeded $3,840,000. But this and many other mysterious discrepancies in the financial maneuverings concerning the tankers are of little importance. It is important to note that the essence of the scheme was to make the second mortgage bonds, plus a bonus, good, while the first mortgage (which was really the title to the ships), was sold by the government for less than 22 per cent. of what it cost the government.

This report controls on all material questions as to the value of these ships. Although it has been argued that they were fairly worth at that time about $8,541,000 (and that the contract price was subsequently reduced to that amount), there is no evidence entitled to any substantial weight supporting that valuation. The argument that the federal government was by the fraudulent concealment of this contract (which put the oil companies essentially in the position of mortgagors) induced to sell ships worth $8,-541,000 for $2,940,000 is not appropriate in a federal court. The Shipping Board must be assumed to have acted, not only honestly, but under the advice of the best experts, as to the real value of these 7 tankers, when they sold them (although in form a sale of the first mortgage) in March, 1922, for $2,-940,000. On all the evidence, the court is constrained to find, and does find, that the fair market value of these ships in November, 1921, and in March, 1922, did not exceed $3,000,000.

What induced, or compelled, the directors of these oil corporations to enter upon this contract, does not clearly appear. No director voting for it, except Palmer and Cochrane, has been called to explain the transaction. It remains unexplained, and upon the present record does not appear susceptible of an honest explanation.

Stripped of confusing disguises and passing exceptions of negligible present importance, this transaction amounted to an agreement to transfer the property of the creditors of the Holding Company to the Tanker Syndicate—a gift of millions of other people's money to the Tanker Syndicate by boards of directors who represented little or no investment in the oil enterprise. From the standpoint of the Tanker Syndicate, a loss of several millions in second mortgage bonds was transmuted into a handsome profit at the expense of a lot of scattered noteholders of the oil corporation. The court is

compelled to believe and to find that the accomplishment of this result was the controlling motive of the original tanker contract and that of the reorganization later planned and effected under the controlling influence of parties interested in that contract.

As noted above, the receivership of the Holding Company involved, potentially, both the Refining Company and the Canadian company, so that, taking control of all the stock of both of these companies, the court became responsible for the fundamental policies and conduct of both of the subsidiaries. Plainly, if the court had known the destructive character of this contract, and that the board of directors then in control of the Refining Company (the chief asset of the receivership estate) had voted for it, the first step would have been to oust that board of directors from control of that chief asset of the court's trust estate. No court would share responsibility for the administration of a trust estate with a board of directors who had evidenced their fidelity to their trust, and their business capacity, by passing those votes. The concealment of the tanker contract, and of the conduct of the directors of the Refining Company in voting for it, was an intentional fraud upon the court, and, through the court, upon the beneficiaries of the court's trust.

As a part of the tanker transaction, Smith and Chace became members of the boards of directors of the oil companies, and thereafter, with the Old Colony Trust Company, dominated them in all important business matters, as well as in the reorganization thereof. Holding over the oil corporations a contract for over $17,000,000 for the purchase of ships that were worth only $3,000,-000, it was immaterial whether or not they constituted or named a majority of the board of directors. The executive committee of the Refining Company became: Cochrane (with Farley as alternate), Palmer, Smith, Chace, and Treat. Smith and Chace were in the Tanker Syndicate; Cochrane, Farley, and Palmer had voted for the contract.

The evidence shows in multiform fashion that the parties believed that the tanker contract would never bear examination. An illustration is found in the certified accountants' reports. These reports, based on the bookkeeping, show that the ships and the purchase price were never properly entered as assets and liabilities. When they were contracted to be bought by the oil companies they became to the extent of their real value ($3,000,000) an asset of the enterprise, and

should have appeared in the balance sheet; and the purchase price of over $17,000,000, although payable in installments, was as definite a liability as a bill payable for oil. But not only in the reports of the certified accountants, but throughout the record subsequently made in this court, as well as in the records of the committee, runs a concerted attempt to disguise and conceal the realities of the situation. This concealment, however, is only one among a multitude of facts which force the mind to the same conclusion —viz. the parties concerned understood that the transaction, if exposed and tested in court, might be found grounded in fraud, and therefore voidable.

Whether voidable for fraud or not, it was a transaction that should have been fully disclosed to the court and to its intended victims, the chief beneficial owners of the receivership estate. The committee had no right to conceal it and to use their powers, as trustees of the assigning beneficial owners and as appointees of the court, to affirm and effectuate it. While not, as a committee, responsible for making it, their later conduct fell little short of full adoption.

This contract took effect as of January 1, 1922. Under it, all the earnings and profits that the oil enterprise could possibly have made were diverted, potentially, from the noteholders of the Holding Company, who were essentially the stockholders of the Refining Company, to the three banking concerns—the Tanker Syndicate. Moreover, the same forces that had sacrificed the investors in the oil enterprise for the benefit of the Tanker Syndicate remained in actual, and apparently in invincible, control of the enterprise.

But in the summer of 1922 this control was put in jeopardy by a judgment against the Holding Company for nearly $1,200,000, subsequently reduced by the Circuit Court of Appeals to about $940,000 (288 F. 961), by the Island Oil Marketing Company. The chief asset of the Holding Company was the stock of the Refining Company. The Holding Company was in no financial condition to pay a judgment of $1,000,000, or even to put up a supersedeas bond in order to perfect an appeal. At an execution sale, the judgment creditor for $1,000,000, if the other creditors were not organized, would have had a great advantage in bidding, and would probably have become the owner of stock and taken control of the Refining Company. A new board of directors would have been certain to discover the situation and sue to

set aside the tanker contract—a result that the forces then in control intended to avoid, if possible.

The situation presented a dilemma to those interested in protecting the contract. If, on the one hand, the judgment creditor was permitted to enforce a judgment against the stock of the Refining Company, the tanker contract would be in jeopardy under a new control. If, on the other hand, a receivership was sought, in order to prevent the judgment creditor from forcing a destructive sale of the stock, adequate and truthful disclosure of the real situation to the court, or to the Holding Company's noteholders, would have resulted in the immediate extension of the receivership to the Refining Company, or in instructions to the receiver to take effective proceedings to test the validity of this contract. Plainly the tanker contract for over $17,000,000 was a greater menace to the property rights of the real owners of the oil enterprise than was the judgment of the Island Oil Marketing Company for about $1,000,000.

Under these conditions, the course adopted was to apply for a receiver, so framing the pleadings and directing the proceedings as to conceal the gist of the situation from the court and from most of the creditors of the Holding Company.

The bill (outlined above) was prepared in the office of counsel for the Tanker Syndicate, Graustein, and carefully revised and approved by Palmer, who had voted for the tanker contract. The actual drafting of the bill was done by one of the juniors, familiar with this sort of practice. In fairness, it should be said that there is no adequate reason for the court to assume that this draftsman had any reason to suppose that the bill concealed or disguised facts which should have been brought by the bill to the court's attention. In fact, there was serious breach of duty in that regard; the tanker contract was the most important single fact in the whole situation. The plaintiff was a clerk in the First National Bank, to whom a claim had been assigned in order that he might thus function. Palmer, who subsequently acted as counsel for the committee, which he was one of the chief factors in organizing, caused an answer to be filed admitting the allegations of the bill and joining in the prayers thereof. On the bill and answer, Judge Mack, in July, 1922, appointed two receivers; one Gaspar G. Bacon, an executive officer of the oil companies, and (apparently at the suggestion of counsel for the Is-

land Oil Marketing Company) Irvin McD. Garfield, who represented no inside interest.

The receivers understood from the time of their appointment that they were expected by the dominant interests to play but a minor and incidental part. The result was that Mr. Garfield was left generally uninformed, or misinformed, as to the real situation. That he intended to do his full duty is not questioned by the court or by any one else. On the case as now shown, it is clear that the weight of legal and business responsibility resting upon the Committee, and upon their counsel, cannot be lightened by arguing that Mr. Garfield might have discovered more of the facts and brought them to the court's attention. The blunt truth is: The parties who controlled the situation did not intend that Mr. Garfield should get at the crux of the situation and disclose it to the court. Palmer wrote Hart, commenting rather ironically upon Mr. Garfield's taking his job "so seriously." This attitude toward the court's receiver is but one of numerous indications of the utterly false perspective with which this Committee and their counsel approached the problem of advising a federal court as to how it should administer a substantial trust estate.

We come to the history of the constitution of the Committee. Palmer, Hart, and Wing were three of the executive committee of the United Fruit Company, which had purchased $500,000 of the 8 per cent. notes of the holding company and had a contract for sharing in the prospective oil output in Venezuela. Palmer was also one of the directors of the oil companies who had voted for the Tanker contract in which the Old Colony Trust Company, of which Hart was vice chairman, was one of the three parties in interest. As the Tanker contract potentially transferred the property of the Holding Company's noteholders to the Tanker Syndicate, in which the Old Colony Trust Company was an owner, no person could possibly be more disqualified to act for the benefit of the scattered and uninformed noteholders than the vice chairman of the Old Colony Trust Company. So as to Palmer, who had voted for the Tanker contract. Nevertheless, these two men took the lead in forming the reorganization committee and in directing its course throughout the entire proceedings.

In September, 1922, it was contemplated that Mr. Andrew W. Preston, then president of the United Fruit Company, should be one of the Committee. But on September 21, 1922, Palmer wrote Mr. Preston, suggesting

that the burden was too heavy for him, and that Hart should go on the committee in Mr. Preston's place, adding:

"The sole object of this request is that he may in appearance be the representative of the United Fruit Company, which owns $500,000 of notes (out of a total issue of $5,000,000 notes), and not as a representative of any supposed interest in the Old Colony Trust Company."

The supposed interest of the Trust Company, which Palmer did not want Hart "in appearance" to represent, was the Tanker contract.

Palmer inclosed in this letter a draft of a letter to be signed and sent by Mr. Preston to Hart, requesting Hart to act as a member of the Committee. Mr. Preston signed and sent the letter. There is nothing to indicate that at that time he knew of the existence of the Tanker contract, or that it had been voted for by Palmer, and that the Old Colony Trust Company was one of the Tanker Syndicate, or the bearing of the contract upon the ability of the Oil Company to meet its notes, including the $500,000 note held by the United Fruit Company.

Forbes, president of the State Street Trust Company, who also had voted for the Tanker contract, was selected by Palmer and Hart as one of the prospective committee. So, also, was Wing, president of the First National Bank. Both of these banks apparently (the evidence is not quite clear) held some of the 8 per cent. notes of the holding company as collateral security for obligations of Cochrane, Harper & Co.; there seems to be no direct evidence that they were out and out owners of these notes. Later Palmer and Hart arranged with Mr. Aiken, president of the Shawmut Bank, to be one of the committee, and still later, that Mr. Finsthwait, of New York or Pennsylvania, who had been instrumental in selling about $1,500,000 of the notes, should join the committee.

T. H. West, Jr., of Rhode Island, was also named, apparently as a representative of notes sold in his vicinity.

Nothing could be clearer than that Hart, Forbes, and Palmer were entirely disqualified to present themselves as trustees of the creditors of this receivership estate and seek an appointment from this court to guide it in a reorganization adapted to conserve and protect the rights of the beneficial owners of that estate. The rest of the Committee knew, or shortly ascertained, the true situation and what was really intended, and gave their assent thereto.

The Committee was not formally organized until November, 1922. Meantime in September and October there was discussion in the executive committee of the Refining Company (Chace, Smith, Palmer, Cochrane, with Farley as Cochrane's alternate, and sometimes Treat) of a reorganization plan promoted by an outside banking concern. The meetings of this executive committee were attended, apparently at will, by Stockton, the president of the Old Colony Trust Company, and by Graustein counsel for the Tanker Syndicate. The Tanker Syndicate, then recognized to be in control of the oil enterprise, refused to go on with this plan. But this abandoned or rejected plan, promoted by outsiders, is of little or no materiality. The bulky evidence concerning it has but trifling present significance. It is entirely clear that no honest and competent banking concern could float any securities of the oil enterprise so long as the Tanker contract was outstanding and claimed to be valid, and that no outside concern could get any chance the Tanker interests wanted for themselves.

As early as October or early November, Smith presented to Palmer, to Hart, and to some at least of the other parties in interest, his (the Tanker Syndicate's) plan of reorganization. Passing minor details, the main features were: (1) The Holding Company was to be abandoned, and the assets of the enterprise turned over to, or to be held for the benefit of, the Refining Company, which was to be thereafter the real operating and controlling concern.

(2) Creditors of the Holding Company were to receive preferred stock of the Refining Company (without voting power) with a small bonus of common stock (no par) in settlement of their debts, which aggregated about $6,500,000, including the judgment of the Island Oil Marketing Company and Wiltsee's claim.

(3) Intercompany's debts (with perhaps negligible exceptions) were to be canceled.

(4) There was to be a new $5,000,000 second mortgage bond issue of the Refining Company to be marketed at 85, thus producing $4,250,000 of cash.

(5) A large part of the proceeds of this new bond issue was to be applied forthwith to the accrued liabilities under the Tanker contract.

(6) 1,500,000 (no par) of common stock of the Refining Company was to be issued and so used in connection with the marketing of the bonds as to keep full control in the Tanker Syndicate or its nominees.

It was obviously vital to the Tanker Syndicate that control should never pass into the hands of the noteholders of the holding

company, or otherwise away from the forces that had, through the Tanker contract, undertaken to transfer a large part of the oil companies' property to the Tanker Syndicate.

About November 10, 1922, Smith, furnished with financial data as to the condition of the enterprise, went to Great Britain and there, in the language of the committee, "sounded out the markets for the" proposed bond issue. Chace had been in Europe in October, whether in connection with this plan does not appear. But it does appear that Smith and Chace collaborated in the sale of the bonds and divided the stock profits between their concerns, 60 per cent. to Smith and 40 per cent. to Chace. The fair inference is that on this trip Smith tentatively offered the expected second mortgage 8 per cent. 20-year bonds at par, without any bonus of common stock; for such was the actual printed offer made by his concern in March, 1923.

Neither Smith nor Chace has testified at this trial. In this connection it should be stated that seasonably in the trial counsel for Wiltsee presented a summons, duces tecum, to run without this district, to obtain the evidence of Smith and Chace. Thereupon assurances were given by counsel for the committee to the effect that Smith and Chace desired to appear and would appear and give their testimony. This was the understanding until near the close of the trial. Then counsel for the Committee, whose good faith is not in question, was compelled to state that he could not make good his assurances. But he declined to summon Smith and Chace; their volition still controlled the Committee. Wiltsee's counsel did not then ask the issuance of the summons; he, naturally enough, preferred to close his case on the evidence adduced, and to argue inferences fairly grounded on the nonproduction of Smith and Chace, and of other witnesses and evidence which the Committee might fairly have been expected to produce.

Under such circumstances, the inference is that, if Smith and Chace had been produced, their testimony would not have bettered the case of the Committee. Of the Committee only Hart and Finsthwait have testified.

Smith's original plan was in all important aspects the plan finally carried through. Variations therefrom were only as to minor points, or on matters not substantially affecting Smith's three controlling purposes, which were: (1) To have the second mortgage bond issue put out by the Refining Company at 85, with the expectation that Smith and Chace (directors of the Refining Company) would derive from the sale of these bonds a large cash profit. (2) That the stock of the Refining Company should be so rearranged as to insure permanent voting control of the enterprise to the Tanker Syndicate or their nominees. A voting trust was later added for further assurance of undisturbed control. (3) That of the new money expected to be obtained from foreign purchasers of these bonds the Tanker Syndicate should forthwith absorb a large proportion—in the outcome it was about 41 per cent.

In no particular is it shown that the Committee induced or constrained Smith and the other Tanker forces to vary their plan in the interest of the Committee's cestuis.

Forthwith after Smith sailed, Palmer proceeded to organize the Committee for the express purpose of effecting the Smith plan, as it did effect it. On all the evidence it must be found, and it is found, that the Committee was not organized to protect the interests of the noteholders; it was organized to put through Smith's plan.

The real facts as to the origin of, and part played by, the Committee in this reorganization are in striking contrast with the account given by Hart on his direct testimony. In effect, Hart said that, in September, 1922, he was drafted by Mr. Preston, president of the United Fruit Company, to represent the United Fruit Company; that a little later Hart and Palmer selected the best available representatives of the noteholders; that the Committee was organized in late November, and then entered upon a careful study of the complicated financial situation of the oil enterprise, continued, until, in January, 1923, they produced a preliminary plan of reorganization; that in February, 1923, the plan was perfected and, after approval by the court, put through by the Committee. Hart emphasized that in this case the plan was "distinctly a product of the committee itself"; also that he was uncertain how much of the plan Smith saw before it was adopted by the Committee and issued; that the entire Committee were active and contributed constructive ideas that ultimately entered into the plan.

In truth, the plan was Smith's (or the Tanker Syndicate's) plan, formed by Smith weeks before the Committee was organized. Hart had from the outset known all about it. The chief documents affecting it were drawn by Graustein, counsel for the Tanker Syndicate. The plan was not devised by this committee. The Committee, as constituted, was devised to sponsor, and did sponsor, the Tanker Syndicate plan, devised by Smith.

The record of this Committee's activities

(Exhibit 4) is an important part of the evidence, read, as of course it must be, in the light of the conditions then surrounding the parties. Its omissions are significant as well as its inclusions. It starts as follows: "To Messrs. Alfred L. Aiken, Frank Finsthwait, Allan Forbes, Francis R. Hart, Thomas H. West, Jr., and Daniel G. Wing:

The undersigned, holders of 8 per cent. convertible gold notes of the New England Oil Corporation to the amount set against their names respectively, hereby request you to organize and act as a committee to represent the notes and receive deposits thereof with the Old Colony Trust Company as depositary under an agreement in form satisfactory to yourselves."

The signers of these requests are Cochrane, Harper & Co., for $720,000, the Refining Company for $322,000, the First National Bank for $429,000, a few small holders apparently connected with the Refining Company to an aggregate of $30,000, and the United Fruit Company for $500,000. This makes an aggregate of about $2,500,000 out of $5,762,000 of notes issued, leaving approximately $3,260,000 of scattered investors, 600 to 700 in number, who had furnished about one-third of the capital used in the oil enterprise, and who neither joined in the request nor had any real knowledge as to what was going on.

These creditors did not "request" the bankers to represent them; the bankers *requested* these investors to put their notes, in trust, with the bankers. As to the bulk of investors, the Committee were pure volunteers, soliciting to be made trustees for purposes which, in fact, were adverse to the interests of their cestuis. The agreement vested the broadest power in the committee, including title to the notes deposited.

The record of the first meeting of this committee is set forth in the margin.[4]

[4] "November 17, 1922.

"At an informal preliminary meeting in connection with the organization of a committee to protect the interests of holders of New England Oil Corporation five-year 8 per cent. notes, there were present the chairman, Mr. Hart, and Messrs. Aiken, Finsthwait, Forbes, Palmer, Wing, and Acting Secretary Shaw. They were later joined by Messrs. Chace and Graustein.

"As a result of the discussion as to the advisability of giving Mr. Smith a firm option on the proposed issue of $5,000,000 second mortgage bonds of the new company, it was the sense of the meeting that, inasmuch as it is impossible at present to anticipate how long a time will elapse before the necessary approval of the court can be obtained providing for the reorganization of the company and the new

It is significant that at this "preliminary meeting" Chace and Graustein, not members of the committee, but representing the Tanker Syndicate, were present, Graustein at Palmer's insistent invitation; that Chace insisted that the notes of the Refining Company secured by first mortgage on steamships should have the same treatment as the holders of the Refining Company mortgage bonds. This, construed in the light of the actual tanker situation, means that at this first meeting Chace was insisting that the $13,500,000 mortgage on the tankers, which he had bought from the government in the previous March for $2,940,000, was on a parity with the first mortgage bonds of the Refining Company.

To the noteholders this committee issued forthwith a circular copied in the margin.[5]

financing, it would not be practicable to enter into any firm agreement with Mr. Smith in regard to certain proposals he has made relating to the sale of these bonds, and that Mr. Hart should hand to Mr. Graustein, counsel for Mr. Smith, a statement as per Exhibit A attached hereto.

"A draft of the proposed circular to be sent to noteholders (Exhibit B) and of the proposed deposit agreement (Exhibit C) was submitted, and it was the sense of the meeting that these were in proper form.

"Mr. Chace stated that it was his opinion that holders of notes of the New England Oil Refining Company secured by first mortgage on steamships should have the same treatment as the holders of first mortgage bonds issued against the plant of the Refining Company. He pointed out that, although no default had been made on the first mortgage bonds secured by the plan, interest and sinking fund payments had been defaulted, aggregating a substantial amount, on the notes secured by the ships, and he desired to have it clearly understood that he was opposed to any policy which would not cure this situation.

"S. P. Shaw, Jr., Acting Secretary."

Exhibit A.

"To Mr. Smith: Noteholders' committee organized and has asked deposit note. The general plan has full support of committee, but as approval of court is necessary the time when actual agreement can be made is so uncertain that definite undertaking is impossible. Subject to deposit of notes, approval of court, and satisfactory agreement as to division of equities and price of bonds, the committee will proceed in good faith to put itself in position to co-operate along lines you suggest. "Noteholders' Committee (in formation), By Francis R. Hart, Chairman." Presumably this was cabled to Smith.

[5] "To the Holders of Eight Per Cent. Convertible Gold Notes of the New England Oil Corporation Dated 1st June, 1920:

"At the request of the holders of a large amount of the above-described notes of the New England Oil Corporation (of which $5,-

Inevitably, on such representations made by leading bankers, most of the notes were shortly turned in to the Committee as assignees. Ultimately all claims, except Wiltsee's, were thus assigned to the committee (or their nominee), who thus became the legal owners of nearly the entire trust estate.

Other records of the meetings of this Committee, while significant, need not be quoted. In rough outline, the evolution of the reorganization plan was as follows:

(a) The plan for a second mortgage bond issue was, as already indicated, adopted, not for the purpose of furnishing to the oil enterprise working capital for the extension of its plant and the development of its oil fields, but in order to pay up arrears under the Tanker contract and to disguise the intolerable burden put upon the oil enterprise by that contract, as well as to cloak a reorganization through which the Tanker interests should acquire the bulk of the common stock, thus insuring their continued control of the enterprise, with power to absorb any large profits which might accrue from the successful development of the oil fields.

(b) In November and December it was thought that Smith would obtain such assurances of a European market for the bonds that he, alone or with the other tanker interests, would agree to take at 85 the entire $5,000,000 bond issue, "sweetened" by a majority of the immediate common stock issue of 1,000,000 shares.

(c) But Smith on his return declined to bind himself or the Tanker interests to that extent, so that a little later the discussed plan was that the Tanker interest should agree to take one-half the bond issue, leaving the other half for the banks and larger noteholders to purchase.

(d) A little later Smith drove a harder bargain. He insisted that the Tanker interests would bind themselves to take only $1,700,000—substantially one-third—of the bonds, and that the other $3,300,000 should be underwritten by the bankers, noteholders, and other parties in interest, giving, however (and this is important), to Smith a firm option, for eight months, to take the rest of the bonds at a price running from 87 to 89 during the option period. This, in substance was what was done. Accordingly an elaborate underwriting syndicate agreement, dated December 11, 1921, was executed. Hart, Chace, and Wing were the syndicate managers.

After a long preamble, to the effect that the Refining Company needed more working capital, that the creditors of the holding company were expected to be settled with

---

762,000 are outstanding), the undersigned have consented to act as a committee to represent the interests of the said noteholders.

"The semiannual interest payable on the 1st December, 1922, on the above notes cannot be paid. For this, and other reasons, it is greatly to the advantage of the noteholders to provide for concerted action for their protection. The only substantial assets of the New England Oil Corporation consist of all of the shares of stock of the New England Oil Refining Company outstanding (75,000 shares, of the par value of $100 each), and an interest in all of the shares of the New England Oil Corporation, Limited, which owns various oil lands and concessions in the republic of Venezuela.

"The New England Oil Corporation is now in the hands of receivers appointed by the United States court. This action was taken on account of a judgment obtained against the corporation by the Island Oil Marketing Corporation. The receivership proceeding was instituted by creditors, in order to prevent the said judgment from constituting a lien upon the assets of the New England Oil Corporation having priority over the claims of other creditors.

"The business of the New England Oil Refining Company has increased to substantial proportions and in many aspects may be regarded as highly satisfactory. But the company's working capital should be substantially increased in order to enable it to conduct its rapidly increasing business to the greatest advantage. While various suggestions have been considered in this behalf, no definite plan has

yet been reached. In order to protect the holders of the notes of the corporation, it is also most desirable that the holders of such notes should be adequately represented by a duly authorized committee.

"A committee agreement has been executed by the undersigned and deposited with the Old Colony Trust Company. The holders of the said notes are requested to deposit their notes immediately with the Old Colony Trust Company, 17 Court street, Boston, as depositary under the agreement, receiving transferable certificates therefor. Each note should be accompanied with all coupons due on and after December 1, 1922. Noteholders may obtain copies of the agreement from the depositary.

"Francis R. Hart, Chairman.
"(Vice-Chairman, Old Colony Trust Company.)
"Alfred L. Aiken,
"(President National Shawmut Bank.)
"Frank Finsthwait,
"(Vice President First National Bank of Cherry Tree.)
"Allan Forbes,
"(President State Street Trust Company.)
"Thoman H. West, Jr.,
"(President Rhode Island Hospital Trust Company.)
"Daniel G. Wing,
"(President First National Bank of Boston.)
"Secretary: S. Parkman Shaw, Jr., 17 Court Street, Boston.
"Counsel: Messrs. Storey, Thorndike, Palmer & Dodge, 53 State Street, Boston.
"Dated: Boston, Mass., 21st November, 1922."

by issuing to them preferred and common stock of the Refining Company, that there was to be a second mortgage bond issue of $5,000,000, to be sold (with 560,000 shares of common stock of the Refining Company) at 85, thus producing $4,250,000; that it was contemplated that such bonds might be resold by the syndicate managers at 87, with 100.8 shares of the common stock per bond—the gist of the agreement, following is that the *managers were to have full power to dispose of all underwritten bonds and common stock at their discretion.*

The result was that, while the underwriters might be bound to take the bonds at 85, with a bonus of common stock, the managers kept complete legal power to sell the bonds at discretion; indeed, they announced in the plan that they contemplated selling them at 87, thus giving to the underwriters two points and a little bonus of common stock. This was what was later done. The underwriters were not real purchasers; the bonds were not sold to them, as has been argued. Under this underwriting agreement, subscriptions were obtained for the full $5,000,000 of bonds, a few of them from scattered noteholders, who were, of course, without knowledge of what was really going on. The Tanker Syndicate subscribed, in form, for $1,700,000; but, as it was in full control of the situation, this amounted to no more than offsetting an apparent subscription for the bonds (which called for $1,455,000 in cash) against a contemporaneous payment of over $1,755,000 to the syndicate, derived from the proceeds of the bonds. Otherwise stated, the Tanker Syndicate immediately took out from the proceeds over $300,000 more than it put in.

There were two main purposes for this underwriting agreement:

(1) It disguised the real situation by giving to the noteholders and other parties in interest what seemed to be an opportunity of subscribing for the new securities and making a profit therefrom, if those securities proved to be good, while in fact, if the securities proved marketable, Smith or the Tanker Syndicate would take and sell them at a large profit.

(2) If the bonds had proved unmarketable, to the extent of about two-thirds, the underwriting noteholders would have taken the risk and possible loss.

It was, on all the evidence, not an underwriting agreement devised for the benefit of the owners of this receivership estate.

In the early days of this investigation, counsel urged repeatedly, in justification of "the reorganization by the insiders," that the Committee had exhausted efforts to get from the noteholders the new money alleged to be needed for working capital, and therefore turned to Smith and Chace, directors of the Refining Company. It was also contended that the noteholders were given every possible chance to share in any profits accruing from the new financing. Presumably, learned counsel making these broad assertions believed them true. In fact, they were untrue. At no time was any opportunity given, by the Tanker interests, for the real owners of this trust estate to get control of it, or to share substantially in the profits intended to accrue from its reorganization. On the contrary, from the time the Tanker contract was executed in November, 1921, to the end of the reorganization and to the present moment, Hart (the Old Colony Trust Company), Smith, and Chace have exercised complete control over the oil companies, and over every chance to profit, substantially, out of marketing the new bonds.

At a meeting of the Committee, on January 23, 1923, there were present Messrs. Hart, Aiken, Forbes, Finsthwait, and Wing. Palmer, as counsel, and Chace and Smith also participated in the discussion. Votes were passed approving the plan in its revised form and the documents, called "contracts," which set forth some (but by no means all) of the arrangements among the parties in interest for effecting their real plan.

"The chairman presented at the meeting a copy of the petition which was filed January 22, 1923, on behalf of this committee in the District Court of the United States for the District of Massachusetts, requesting the court to approve the plan of reorganization and to authorize the receivers of the New England Oil Corporation to participate in the same."

It was voted:

"That the action of the chairman in causing the said petition to be filed as stated above be and it hereby is ratified, approved, and confirmed."

This shows that the committee and Smith and Chace knew just what representations were being made to the court in order to obtain the court's approval of their proposed disposition of the trust estate. All were parties to the scheme of deceiving the court.

It was also voted that the secretary mail a copy of the order issued by the court on the petition of January 22, 1923, to each holder *"except those who have already deposited * * * with this committee."*

The return of the service of this order discloses a peculiar situation. The Old Colony Trust Company not only acted as depository for the notes, but in general as the agent of the receivers for the service of notices and the receipt of proofs of claims. The affidavit of the secretary of the Old Colony Trust Company on the return of the order of notice, issued to all parties in interest to show cause why the plan suggested should not be approved, sets forth that this notice was sent to the list of noteholders, "*excepting those whose names were checked as indicating a deposit under the noteholders' agreement of November 15, 1922.*"

It thus appears that a large part of the real parties in interest who had deposited their notes with this Committee never had *actual* notice of the plan. The Committee, as assignees of these noteholders, treated themselves as owners, at least for the purpose of receiving the notices issued by the court and of assenting in behalf of their assigning noteholders. This was wrong. It may have been inadvertent; but the notices should have gone to the beneficial owners of the claims.

While it is not probable that, if the creditors had received these notices, they would or could have studied into the situation and got at the real scheme, the methods pursued emphasize the extraordinary extent to which the committee and the Old Colony Trust Company took substantially complete control both of the notes and claims of creditors and of the receivership estate.

[4] On February 20, 1923, Finsthwait, dissatisfied with the Committee's plan, presented a rough outline of an entirely new one; but he was pungently reminded that cash must be produced on March 1 to meet the interest and sinking fund payment on the first mortgage bonds. This resulted, as the dominant forces knew it would, in compelling Finsthwait to assent to their plan. He thus joined in the maladministration and is liable with the rest of the committee. Ashley v. Winkley, 209 Mass. 509, 528, 95 N. E. 932.

As noted above, the omissions from these records are significant. Nowhere do we find any record of any discussion of the controlling relations of the Tanker Syndicate, through Hart (who was acting as chairman of the Committee), through Palmer and Forbes, who had voted for the contract, and through Smith and Chace, members of the executive committee of the Refining Company. Nowhere is there any suggestion that the Tanker contract could be regarded

as invalid, or that the mass of noteholders, uninformed of its existence, were entitled to independent advice and representation as to their rights adverse to that contract. On the contrary, the records throughout indicate that the Committee assumed that the adverse and conflicting interests of Hart, Smith, and Chace (and, because of having voted for the contract, of Palmer and Forbes) might properly be concealed both from the real owners of the receivership estate and from the court that was responsible for the administration of that estate. The gist of the real situation was not in these records disclosed at all. The records do show, affirmatively and negatively, that the Committee, as constituted, recognized that it could do nothing, except with the assent of the Tanker interests. Finsthwait was dissatisfied, and, as his evidence shows, did the best he could to get a better trade with the Tanker interests for the noteholders. His moral and business position is better than that of any other member of the Committee; he appeared and testified freely and frankly. But he was powerless, and, instead of resigning or bringing the situation to the attention of the court, he finally approved of the plan. Although Aiken and West have not testified, it is probable that their attitude was substantially the same. There is nothing in the record to indicate that these three men had an adequate motive for leaving this receivership estate, as it was left, at the mercy of the Tanker interests. Nevertheless they chose to assent to what they must have understood was a sacrifice of the rights of the real owners of this trust estate to the Tanker interests, rather than break with their associates, resign from the Committee, or bring the situation to the court's attention.

As to the Tanker situation, it is apparently shown that the old contract for about $17,300,000 was disposed of by a covenant that the Refining Company should not be sued on it unless with the Refining Company's assent. As the same forces continue to dominate, it is obvious that the assent can easily be obtained, if desired. But a Tanker Syndicate claim for about $18,000,000, filed against the Oil Corporation, stood for months; but was later, by agreement, disallowed. It seems not to have been noticed by the receivers—at least they never called it to the court's attention, *with the implications which are suggested.* In lieu, then, of the old contract, a new arrangement was made, under which, it is claimed, the tankers were to cost the oil enterprise $8,541,000. There is much confusion as to

these figures, particularly those relating to deferred payments and interest. It is not clear that the cost will not exceed $8,541,-000. It is clear that the cost will be at least that. The time for paying for these tankers was extended from 10 to 15 years; but it was made a condition of the new arrangement that the Tanker Syndicate should receive' on back payments and interest, out of the proceeds of the second bond issue, $1,755,491.06, about 41 per cent. of the proceeds of that bond issue. And the new price was made, not out of regard for the creditors of the receivership estate, but because the Tanker forces regarded this as\ all the enterprise could carry and succeed. At any rate the scheme made the second mortgage bonds of the Tanker Syndicate good, with a bonus and 7 per cent. interest, while the United States lost over $10,000,000 on its first mortgage.

After the approval of the plan, the next step was for Smith and Chace to market the bonds, as they had originally intended, to Scotch purchasers. To that end Smith, in collaboration with Palmer and Hart, and probably with some of the other members of the Noteholders' Committee, prepared a circular, dated March, 1923, but undoubtedly substantially completed, if not actually printed, long before the court approved the plan of reorganization of February 17, 1923. This circular offers this issue of second mortgage bonds at par and accrued interest, without any bonus of common stock, or any warrants carrying an option to purchase common stock at $10 per share. This offering was plainly in accordance with the original purpose of Smith, Chace, and the Committee. Otherwise stated, it was never contemplated that these bonds should be sold with a bonus of common stock to the investing public, or to the creditors of the estate at or near the price of 85, as the approved plan indicated, and as the receivers reported.

This prospectus, issued with the implied approval of reorganizers acting under the authority of a federal court, calls for disapproval. In it Smith sets the assets of the Refining Company as follows:

#### Assets.

| | |
|---|---:|
| Land .....................$ | 3,368.576.00 |
| Plant ....................... | 9,702,386.06 |
| Oil rights .................. | 5,000,000.00 |
| Investment in marine equipment. | 2,159,757.82 |
| Net quick assets .............. | 3,271,599.93 |
| Other assets ................. | 353,104.75 |
| | $23,855,424.56 |

The asset of "Land, $3,368,576," read in connection with the item in the receivers'

first report (supra, page 396), showing the cost of land, up to October 31, 1922, $225,025.36, and in connection with evidence of a later purchase at a cost of either $35,000 or $67,500, indicates that the cost of this land was less than 10 per cent. of the value stated by Smith, with the approval of the committee, in this prospectus for the sale of these bonds.

This circular also conceals the Tanker situation. In its asset column we find "Investment in marine equipment, $2,159,757.82." What this means is not clear; possibly the amount then paid. But included in the circular is a letter from President Cochrane, dated February 28, 1923, to Peabody, Houghteling & Co., in which appears the following statement:

"Tanker Fleet: The company has closed arrangements under which it will acquire seven tankers of the most efficient type, aggregating 84,000 dead weight tons, at a price of $7,488,000, payable monthly over a period of 15 years from January 1, 1923. On account of the efficiency of the vessels and their extremely low cost of operation, the amounts to be paid represent no more than the company would have to pay in chartering ships, and are at the same time sufficient to liquidate both principal and interest of the cost of acquisition. These arrangements in effect provide the company with an efficient fleet at no capital cost, make the crude oils of the continent, wherever located, available to the refinery, and insure the company against the possibility of excessive charter rates that might adversely affect its operations and earnings."

This should be contrasted with the (claimed) substituted contract to buy for $8,541,-000 ships sold the previous March by the United States government for $2,940,000. But in this circular, as throughout the whole record, these tankers are not carried as an asset and liability. The essence of this new arrangement to buy these tankers for $8,-541,000 was thus sought to be concealed from the prospective bond purchasers.

Under the heading "Earnings" is the following:

| | |
|---|---:|
| The company's earnings available for depreciation, interest and federal taxes for the two years ending December 31, 1922, aggregated ........................ | $6,645,164.18 |
| Being at the average rate per annum of.. | 3,322,582.09 |
| Average annual reserve necessary to retire first mortgage bonds, principal and interest ................................. | 754,625.00 |
| Balance for general mortgage bonds.... | $2,567,957.09 |
| To protect a maximum interest charge thereon of ............................... | $ 400,000.00 |

The circular summarized at the end as follows:

"In recommending these bonds, we particularly call attention to the following facts: ·

"(1) The margin of security is ample and should rapidly increase through the operation of the sinking fund.

"(2) The margin of earnings for the protection of interest is nearly 6½ to 1, and as a result of this financing the margin should materially increase.

"(3) Controlling its own oil rights and its own fleet of tankers, having a modern refinery, ideally located on tidewater and rail in the immediate proximity of, the largest fuel oil market in the United States, with the demand for its product safely established, the business of the company is fundamentally sound and profitable.

"(4) The ownership of the property is in strong hands, well able to protect their equity, and the responsible character of the voting trust is the best assurance of continued good management.

"(5) The interest return on the investment is unusually good, considering the soundness and fundamental character of the security.

\* \* \* \* \* \* \*

"*We offer these bonds at par and accrued interest, when, as, and if issued and deliverable.*"

This was an unfit prospectus to be issued by any responsible banking concern, especially unfit when put out as part of a reorganization of a court trust estate. No court could approve the sale of securities on such a prospectus.

[5] If the statements in this circular were true, the bonds were easily marketable and worth par, without a bonus of stock. If they were not true, the fiduciaries representing a court trust had no right to allow these representations to be made to prospective purchasers of securities issued as a part of a reorganization under the control of a court of equity. Again, if these representations were even approximately true, the conduct of the court's fiduciaries in permitting Smith and Chace (directors of the Refining Company) to make a cash profit of from $400,000 to $600,000 and to keep most of the common stock and the stock warrants, for themselves and/or their nominees, becomes a most glaring breach of trust. Smith and Chace, directors of the Refining Company, were under the circumstances not even entitled to reasonable compensation for selling these bonds. Little v. Phipps, 208 Mass. 331, 333, 94 N. E. 260, 34 L. R. A.

(N. S.) 464; Quinn v. Burton, 195 Mass. 277, 279, 81 N. E. 257, and cases cited.

Armed with this circular, Smith, on March 10, 1923, went to Europe, returning April 17. According to the report of the Noteholders' Committee he then sold about $4,200,000 of these bonds. The balance of about $800,000 are reported as sold in this country. The report also sets forth that the average purchase price for all the bonds sold to the public was 95.

It is thus apparent that Smith's original plan of getting the new money from his Scotch clients was carried out as early as April or May, 1923.

The business and financial results of this reorganization are illuminated by the following statement taken verbatim from the records of the committee:

"Memorandum of cash received and disposition of such cash in connection with New England Oil Refining Company readjustment:

Total cash received from all sources, being equivalent to $5,000,000 general mortgage 8 per cent. bonds of New England Oil Refining Company at 85 and accrued interest .....................$4,312,154.22

"Which has been applied or lodged as follows:

| | |
|---|---:|
| Tanker Syndicate, Inc., in settlement of Schedules A, B, and C of Tanker agreement, less S. S. Swiftlight.............. | $1,755,491.06 |
| Payment in full of 7 per cent. serial coupon gold notes, with interest, on July 1, 1923 ...................................... | 405,795.01 |
| First National Bank, for demand loan, $417,000, with interest.................... | 418,807.00 |
| First National Bank, for interest and federal tax due March 1, 1923, on first mortgage bonds ......................... | 192,372.00 |
| First National Bank, for sinking fund payment due March 1, 1923, on first mortgage bonds ......................... | 250,000.00 |
| Old Colony Trust Company, to purchase cashier's checks for payment on overdue accounts payable.................... | 425,000.00 |
| State Street Trust Company, demand note ....................................... | 100,000.00 |
| Merchants' National Bank of Boston, demand note ................................ | 17,500.00 |
| Merchants' National Bank of New Bedford, note due April 17, 1923............. | 60,000.00 |
| New Bedford Safe Deposit & Trust Company, note due April 11, 1923........... | 50,000.00 |
| Retained by Old Colony Trust Company, to be applied for additional land at Assonet ...................................... | 35,000.00 |
| (a) Retained by Old Colony Trust Company, to be applied towards reorganization expenses ................. | 150,000.00 |
| (b) Pay demand loan of New England Oil Corporation, Limited, at First National ..................................... | 100,000.00 |
| (c) Old Colony Trust Company, agent New England Oil Refining Company | 352,189.15 |
| | $4,312,154.22 |

"(a) This sum of $150,000 is reserved by the noteholders' committee in the Old Col-

ony Trust Company to apply towards expenses of the reorganization, $50,000 of which is reserved to take care of the Sun Oil Company claim.

"(b) This sum of $100,000 has been returned to Old Colony Trust Company and has been added to the fund referred to in item C above, increasing that fund to $452,189.15.

"(c) This fund is placed with Old Colony Trust Company by the New England Oil Refining Company as an additional reserve to take care of expenses, etc. It is understood that expenditures from this fund can be made only with the approval of the committee."

This statement shows that about 41 per cent. of the proceeds of this bond issue went forthwith to the Tanker Syndicate and that so much of the rest was absorbed by the banks as to leave practically no working capital with which to extend the business. Representations made to the court and to the parties in interest that the bond issue was intended to furnish additional working capital for a growing and extending business were without basis.

After this reorganization, the concern had no credit, except through a revolving fund provided by the interested banks and secured on "refined products, inventories, and receivables from the sale of such products." Credit so grounded is, of course, always available to this or any other oil enterprise.

The evidence as to the financial results of the operation of the tanker fleet is meager and indefinite. It certainly does *not* prove that the tankers have been operated at a profit; almost certainly it shows that there has been an operating loss. The earnings in 1923 and 1924, after the concern had its own tankers and the new control, were about half the earnings in 1920 and 1921. At any rate the committee has utterly failed to justify, as a business proposition, the purchase of these ships at the alleged price of $8,541,000, or at any other price.

The cost of this reorganization calls for comment.

Assuming, contrary to the fact as found above, the new bond issue legitimate, a benefit and not a burden to the oil enterprise, and the cost of the reorganization may be approximated as follows:

| | |
|---|---|
| Counsel fees | $140,000 |
| Cash cost of marketing new bonds—profits to Smith and Chace, directors of the Refining Company, $400,000 to $600,000—say: | 500,000 |
| Cash disbursements for printing, stamps, etc., and for services to banks | 32,000 |
| Receivers' fees | 22,000 |
| Total cash | $694,000 |

8 F.(2d)—27

All of this came out of what would otherwise have been the working capital of the Refining Company.

Besides cash, the cost included common stock:

| | | |
|---|---|---|
| To Cochrane, as Hart put it, "in consideration of the assistance he was in carrying out the plan of reorganization," out of 157,000 shares, say.... | 100,000 | shares |
| Services of committee | 25,000 | " |
| Syndicate managers | 15,000 | " |
| First National Bank | 5,000 | " |
| Old Colony Trust Company | 5,000 | " |
| To underwriters | 33,000 | " |
| To Smith & Chace | 527,000 | " |
| Total out of present issue of 1,000,000 shares | 710,000 | " |

Also a 10-year option to Smith and Chace on 500,000 shares more at $10 per share.

The value of this common stock, when turned over by the reorganizers, depended mainly on two factors:

(1) The estimate put on the probable success of the oil fields; on this record, the prospects were good.

(2) The amount of real earnings made by the Refining Company operations, if those real earnings could be ascertained from the confusing and conflicting accountant's reports based on the bookkeeping. It is impossible to reconcile many of the figures as to earnings. If, in fact, they were, as Smith put them in his prospectus for the sale of the bonds, about $3,500,000 a year in 1921 and 1922, the common stock had a very large value. There is grave doubt as to whether the concern ever made any such real earnings. Parenthetically, the atmosphere surrounding this oil enterprise from beginning to end is an atmosphere of business unreality; there is a singular lack of definiteness, soundness, and conformity to simple and well-established business principles, not only during the Cochrane régime, but under the Tanker Syndicate régime. Very large alleged earnings mysteriously result in dire financial distress. It is difficult to reach any confident conclusion as to many facts material in considering the value of the creditors' rights when the committee got control, as well as after the reorganization.

At any rate, whatever the value of this common stock, the reorganizers and their nominees took substantially all of it as a part of their scheme of reorganization, and thus, so far as the enterprise as a whole is concerned, as a part of the *cost* of reorganization. This cost fell upon the creditors of the holding company; for, at the outset, they owned substantially all the equity above the valid debts of the Refining Company and of the Canadian company, and

were entitled to control and to most of the chances of future profits, for the Holding Company's stockholders had at most but a thin, and practically negligible, equity.

[6] Under the circumstances, the item of "Counsel fees, $140,000," should not escape judicial disapproval. Of this item, the bill of Palmer's firm was $100,000, of which $70,000 seems to have been paid, and $30,000 still remains outstanding on a note. Graustein, who represented the Tanker Syndicate, received his fee of $20,000 from the Refining Company, the victim of that transaction. Farley, who wrote against, but is not recorded as voting against, that transaction, and who helped guide the court's receivers in the production of the inadequate and erroneous representations they made to the court, charged the Refining Company $20,000.

Even if these fees represent only fair charges for professional labor done (on which no opinion is intimated), the work was not done for the benefit of the Refining Company or for the beneficiaries of the court's trust; most of it was done in an attempt to prevent the Tanker situation from ever coming to the knowledge of the court or of the noteholders whose estate was thus despoiled. It was an unwarranted depletion of the receivership estate. The Committee approved of these charges.

The results of the Tanker contract and the reorganization made in behalf of the Tanker Syndicate, in the consequent legal and financial relation of the cestuis of this court trust to the oil concern, call for further brief analysis.

As noted above, about half of the capital actually furnished for this enterprise was derived from these noteholders. When they made their investment, they bought into an oil concern having, as its chief assets, a large and profitable refining plant and promising oil fields. Current assets and current liabilities may, for present purposes, be regarded as offsetting each other. These noteholders had, then, an interest in the enterprise next in right to that of the first mortgage bondholders.

Then came the Tanker contract, thrusting a liability of $17,000,000 under the noteholders, with an offsetting increase in assets of only $3,000,000.

Next was the reorganization, with its second mortgage of $5,000,000, at 8 per cent., also underlying the substituted preferred stock interest of the noteholders. Under the new Tanker arrangement, over 41 per cent. of the proceeds of this bond issue was immediately taken by the Tanker Syndicate, and a contract for a further payment of $7,488,000 for tankers worth only $3,000,000 was put between the real assets and the preferred stockholders.

Otherwise stated, when these cestuis of the Committee and of the court made their investments, they stood, in right, in the oil enterprise, next to a $5,000,000 first mortgage bond issue. When the Tanker Syndicate reorganization was completed, these cestuis had rights subordinate (passing some reductions on the first mortgage through the sinking fund) to $10,000,000 of first and second mortgage bonds and to nearly $8,000,000 of tanker contract liability. If we reduce this by $3,000,000, the value of the tankers, roughly $8,000,000 to $10,000,000 of debt liabilities had been thrust under the rights of the noteholders, now preferred stockholders. From another approach, the reorganization put under the preferred stockholders $5,000,000 of 8 per cent. bonds and about $5,000,000 of liability for tankers in excess of the value of the tankers.

Apart from the methods used, this analysis falls little short of being conclusive evidence of a grossly unjust and illegal sacrifice of the property rights of these investors in this oil enterprise. But the methods, and not the results, are the gist of the case.

This case presents a striking illustration of the abuses incidental to interlocking directorates. Smith and Chace were made directors of the oil companies, not for the benefit of the oil companies, but for the benefit of adverse interests, and, operating from within, they used their powers as directors of the oil companies for the benefit of the Tanker Syndicate and to despoil the oil companies. Such abuses of fiduciary obligations through interlocking directorates were elaborately investigated by congressional committees prior to the passage of the Clayton Act of October 15, 1914. 38 Stat. 730. By section 8 of that act (Comp. St. § 8835h) Congress undertook to condemn and prevent some of the more notorious abuses. It was found impracticable to prohibit interlocking directors entirely. Frequently they are of great value in business enterprises. But this relation involves a delicate perception of legal and moral rights and obligations. It is also, as shown in a multitude of cases before the congressional committees, often capable of the grossest abuse. Such directors frequently use their inside knowledge and power as a means of appropriating to themselves the property they are, in effect, trustees of.

[7] The outstanding feature of our complex modern business and financial life is the constantly increasing number and delicacy of fiduciary obligations. · On their recognition and faithful performance rests, to a large degree, the safety of a great multitude of property rights, to protect and enforce which are among·the main duties for which courts are created and maintained. All active business men, and particularly bankers, find themselves, in multiform fashion, trustees of other people's rights and properties. There would be little safety for property rights if the powers of a federal court were permitted to be used, as they were sought to be used in this case, in affirming or condoning such breach of fiduciary obligations as this case exhibits. Trustees must be held to faithful and reasonably competent performance of fiduciary obligations.

Stripped of complicating disguises and confusing details, the argument of the committee as to the Tanker transaction runs: The tankers were worth $8,541,000, one-half the contract price of $17,000,000, not one-sixth, $3,000,000. By concealing the contract with the oil companies from the United States government, the tankers were bought from the government for $2,940,000. The price to the oil companies was then reduced to $8,541,000, the vendors getting, as a condition of the reduction, a majority of the common stock of the Oil Refining Company and for Smith and/or Chace perhaps $500,000 cash profit in the sale of the new bonds. A contract to pay only double the known value of these ships was, under such circumstances, no indication that these directors were incompetent or unfaithful. There was, therefore, no obligation on counsel to disclose the truth as to this transaction to the court, when the court's powers were invoked to protect against the menace of the Island Oil judgment. When formed the committee were justified in continuing the deception of the court and of the creditors of the estate. The Tanker interests were also warranted in seeking and obtaining from the uninformed creditors of the receivership estate assignments, in trust, of their claims, to a committee created for the purpose of appropriating the money contributed by these creditors to an oil enterprise. Bankers' losses in second mortgage bonds were thus properly transmuted into profits, while the first mortgagee (the government) lost over $10,000,000. This court rejects that argument.

But (to repeat) the fundamental question in this case is not whether the Tanker contract was valid, or voidable for fraud; the crucial question here is whether this committee was qualified to act, and did act, as the qualified and faithful trustees of the creditors of this estate and as the duly appointed managers of a court trust, devising, submitting, and finally effecting a duly authorized reorganization, in the interest of the creditors they purported to represent. Their relation to the Tanker contract is only one, though an important, factor in that problem.

[8] Coming now to legal results and remedies:

(1) It is plain that the first question, "Was the reorganization invalid?"—must be answered in the affirmative. It was invalid for numerous reasons, only a few of which need now be catalogued:

(a) The committee was formed by Hart, representing the Old Colony Trust Company, one of the three owners of the Tanker Syndicate, and by Palmer, one of the directors of the Oil Companies, who had voted for the Tanker contract. Forbes, another director who had so voted, was made a member of the committee. Palmer was counsel for the committee. All three were, by adverse interest or past action, entirely disqualified to present themselves, either to the scattered creditors of the holding company, or to the court, as representatives of the real beneficial owners of this trust estate. The other members of the Committee knew, either at the outset or shortly after they had agreed so to act, of the Tanker contract, and that the Committee was constituted for the purpose of concealing it from the court and from the mass of the creditors of the estate, and enforcing it, at least to the extent of recouping the Tanker Syndicate for its losses in second mortgage bonds on the tankers, plus $2,940,000, the amount paid for the government's first mortgage of over $13,000,000, plus also a bonus. The entire Committee was therefore disqualified. They obtained their assignments·from their cestuis, and their powers as court appointees, by concealing their disqualification. Cf. Quinn v. Burton, 195 Mass. 279, 81 N. E. 257, and cases cited; Harrington v. Victoria Graving Dock Co., 3 Q. B. D. 549.

(b) This qualification was not theoretical merely. It was actual and dominant. The controlling purpose of the Committee in recommending and effecting a reorganization was to serve the Tanker interests, and not to serve the interests of their cestuis—a duty

accruing both from the assignments of claims and from the court's decrees. Their acts (not merely their motives) were adverse to the rights of their cestuis. Their advice to this court was bad advice.

(c) The plan effected was not the plan approved. The so-called "contracts" annexed to the petition for approval disclose a scheme inconsistent with the plan; they were never approved by the court. Action taken under these documents was unauthorized.

(d) Even if these "contracts" had been brought to the court's attention and had been approved, they would not have disclosed the interlocking relation of Smith and Chace and the Tanker Syndicate to the committee, or that the bond issue was not intended to supply needed working capital, but to pay arrears to the Tanker Syndicate and to cloak a scheme for giving Smith and Chace, directors of the Refining Company, cash profits of from $400,000 to $600,000, besides 527,000 shares of the new common stock. Construing these documents, therefore, as part of the plan approved, the plan effected remains unauthorized and invalid.

[9] (e) Without detailing or repeating other grounds, it is plain that, on all the evidence, it must be found and ruled that the decree of February 17, 1923, approving the plan, was obtained by fraud in law and fraud in fact, and must be vacated.

Counsel for Wiltsee may draft and present an appropriate order to vacate that decree, so far as such decree affects the rights of Wiltsee or of other creditors who may hereafter join in these proceedings and be held entitled to rescind their settlements, saving, however, all rights which may have accrued to bona fide purchasers of the bonds and/or to other parties acting in good faith and without notice.

It is not on this record certain that some of the creditors are not so far chargeable with knowledge as to disentitle them to rescind their acceptance of the reorganization effected; if there are such creditors, the decree must, as to them, stand.

[10] (2) Plainly the court owes an affirmative duty to the creditors to see that they have speedy and adequate knowledge of their rights. These creditors were entitled to assume, and presumably did assume, that they received just and legal treatment in the reorganization of this court trust estate. In fact, they had neither just nor legal treatment. This notice must be given by the receiver, who was kept in office on the objection to Wiltsee, on the theory that other duties might later devolve upon him.

Accordingly, the receiver is directed to cause this opinion, in print, accompanied by an appropriate order of notice, to be sent, by the receiver through his own office forces, as soon as practicable, to all known former creditors and stockholders of the New England Oil Corporation. It is possible that there are other parties in interest who should also have like notice. This order of notice must direct all such creditors and other parties in interest to join in these proceedings on or before a named date or otherwise be barred of all rights arising under these proceedings. The receiver may draft and present a decree, covering this part of the decision, together with an appropriate order of notice.

The receiver has now no assets in his possession. A decree was entered on September 24, 1923, making the Refining Company a party to the proceedings, and directing the receiver to transfer to the Refining Company the remaining assets in his hands, under a stipulation and/or order that the Refining Company should assume payment by it of any further compensation to, or expense incurred by, the receiver and approved by the court. This order and/or stipulation became, therefore, potentially an asset of the receivership estate, to the extent of liability of the Refining Company under order of court to reimburse the receiver for any expense incurred or compensation awarded for further services. The expense of printing and service, and of the receiver's services in relation thereto, will, on approval by the court, be ordered to be paid primarily by the Refining Company, reserving the question of the committee's ultimate liability therefor.

(3) It is equally clear that the mass of scattered creditors who, in good faith and without notice, took from the committee or their agents stocks in settlement of their debt claims are entitled to return their stocks to (or for the benefit of) the Committee and to be thus reinstated to rights as unpaid creditors of the receivership estate. As Wiltsee is but one of a class, all of whom are entitled to like treatment, his rights must rest in abeyance until other creditors entitled to like relief are before the court. Wiltsee's claim for exoneration from the expenses incurred in these proceedings rests upon the theory that he is proceeding in the general interest of a creditor class, and not as a single litigant. On

this record, the doctrine of Von Arnim v. American Tube Works, 188 Mass. 515, 519, 74 N. E. 680, is not now applicable. Pending the return of the order of notice and determination of the amounts due creditors seeking to rescind and held entitled to rescind, the case is not ripe for final decree against the committee.

It may, however, be observed, that on the present record, which, as already noted, is in essence a showing made by the fiduciaries themselves as to the estate taken in trust by them and their administration of it, this estate was, when they obtained control of it, fully solvent. Creditors of a solvent estate are entitled to have their claims paid in full. It is immaterial that this estate originally consisted, mainly, of stock of the Refining Company. Manifestly, the status quo cannot be restored; the Committee have, by their invalid reorganization, made it utterly impossible for the court now to remit creditors to rights against stock, or against the proceeds of stock, having any reasonably approximate relation to the stock of the Refining Company when the Committee obtained control of it. The recapitalized Refining Company, with its second mortgage bond issue and its voting trust, is an accomplished fact.

The position, then, of the creditors of this receivership estate is closely analogous to that of creditors of decedent's solvent estate, whose administrators have, by invalid methods, induced the creditors to assign their claims in trust to the administrators and then to accept from the administrators in payment of their debt claims stocks in a business in which the administrators are largely interested; on discovering the invalidity of the methods used, the creditors may elect to return the stocks and to hold the administrators for full payment of their claims in cash. The crux is that such creditors have a right to rescind settlements procured by invalid methods. So far as the right of rescission is concerned, the showing of depletion of this receivership estate by the reorganization is material chiefly for the purpose of enabling the creditors to act intelligently in electing whether to re-scind or to keep their stocks. If the creditors accept as true the claims of the Committee, they will naturally elect to keep their stocks.

To hold the creditors of this estate entitled to rescind imposes no hardship whatever upon the Committee, if their representations, originally made and still made in these proceedings, are true. Rescission will leave the Committee where they intended to leave the original chief owners of this estate—holders of most of the preferred stock in a corporation whose efficient management is assured through a voting trust, with Chace, Hart, Palmer, Smith, and Wing as voting trustees. To take more stocks will simply round out their holdings in the enterprise they and their nominees acquired through this reorganization.

At any rate, the Committee, fiduciaries of the creditors and of this court, have had their full day in court; they have offered all the evidence they desired to offer as to the status and value of the estate they took, and their administration of it. Their administration was illegal and unfaithful. They have not suggested the insolvency of that estate. Whether they are estopped hereafter to suggest insolvency is a question not raised or argued, on which no opinion is intimated. They assert solvency; for present purposes that assertion stands.

Probably the rights of rescinding creditors should be worked out through the receiver. That point has not been argued; decision on it is reserved until the receiver presents his drafts of a decree and of an order of notice.

(4) On the return of the order of notice the case may stand for further hearing on all issues presented on appropriate pleadings.

[11] (5) Wiltsee is entitled to exoneration from the expenses incurred by him in these proceedings. The court will entertain a petition for the determination of those expenses so far incurred, or it may appropriately rest until the litigation is at or near its termination in this court.

Decrees accordingly.